UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Carmel Garcia, et al., | No. 2:19-cv-02621-KJM-DB |
| Plaintiffs, | ORDER |
| v. | |
| Yuba County Sheriff's Department, et al., | |
| Defendants. | |

The City of Vacaville moves to dismiss the claims against it under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). This is a rare case in which the alleged need for adequate policies and training is so obvious that a single constitutional violation suffices to state a claim under § 1983. *See City of Canton v. Harris*, 489 U.S. 378, 389–90 & n.10 (1989). **The motion is denied.**

**I.     BACKGROUND**

In the winter of 2017, Samuel Levi Yasko was working on a construction site with his brother and a friend. Second Am. Compl. ¶ 13, ECF No. 28. He seemed despondent, and he told his brother he was depressed and thinking about hurting himself. *Id.* ¶ 14. He also asked coworkers if they thought he was "crazy." *Id.* Then he fell from a third-story balcony at the job site, possibly hitting his head. *Id.* His behavior was erratic after the fall. *Id.* ¶ 15. His brother and friend tried to convince him to go to the hospital, but he refused. *Id.*

After several hours, the three left together. *Id.* Yasko's erratic behavior continued on the way home. *Id.* ¶ 16. He tried to strangle himself with a seatbelt, forcing his brother and friend to stop and restrain him, but he soon worked himself free and again tried to strangle himself. *Id.* ¶¶ 16–17. They stopped at a gas station, and Yasko's friend called the police for help. *Id.* ¶ 17. He warned the dispatcher that Yasko was having a mental health crisis and was trying to commit suicide, and he explained he and Yasko's brother were trying to hold him down. *Id.*

When the first officer arrived, the two men told her Yasko was suicidal and unarmed. *Id.* ¶ 18. The officer told them to hold Yasko against the ground with pressure on his back. *Id.* A second officer arrived and immediately knelt on Yasko's back. *Id.* ¶ 19. Then a third officer, a sergeant, arrived and joined the other on Yasko's back. *Id.* ¶ 20. They decided to use a "WRAP" to restrain him. *Id.* A WRAP restraint is a total body restraint in the style of a cocoon. *See Cooke v. City of Stockton*, No. 14-00908, 2017 WL 6447999, at *3 n.3 (E.D. Cal. Dec. 18, 2017). It includes "an ankle strap, upper body harness, [and] a leg restraint." *Johnson v. Cortes*, No. 09-3946, 2011 WL 445921, at *3 n.1 (N.D. Cal. Feb. 4, 2011). When a WRAP restraint is properly applied, it forces a person into "a seated position" with the "legs straight in front" and hands restrained behind the back. *Id.*

The sergeant went to his car to retrieve the WRAP restraint, and while he was gone, the other officers kicked or stomped on Yasko and shocked him with a Taser. Second Am. Compl. ¶ 20. When the sergeant returned with the restraint, three officers were pressing down on Yasko's back, with Yasko remaining prone on the ground. *Id.* ¶ 21. Yasko was a large man, more than 250 pounds and six feet tall, but the officers did not take precautions to avoid the dangers of asphyxia when placing their bodyweight on the back of an overweight person restrained in a WRAP device. *See id.* ¶¶ 19, 29–31. As the officers applied the WRAP restraint, Yasko stopped breathing. *Id.* Officers could find no pulse. *Id.* They called the paramedics, who took Yasko to the hospital. *Id.* ¶ 22. He fell into a coma and later passed away. *Id.*

Yasko's mother and children filed a lawsuit against the City of Vacaville, several of the individual officers who responded to the call, and others. *See* Compl., ECF No. 1. After the complaint was amended, the defendants moved to dismiss, and the court granted the motion. *See*

Prev. Order, ECF No. 27.  The court dismissed the claims against the City because the complaint did not include factual allegations that, if true, permitted the court to infer, as the plaintiffs alleged, that Yasko's death was the result of (1) the City's failure to train its officers "how to deal with persons suffering from psychiatric or physical distress" or (2) the City's "longstanding custom and practice of not providing assistance to individuals suffering from psychiatric, psychological or physical distress." *Id.* at 10–12 (quoting Opp'n at 5, ECF No. 18).  The court however granted leave to amend.  The plaintiffs have now amended their complaint, and the City moves again to dismiss under Rule 12(b)(6).  *See generally* Second Am. Compl.; Mot. Dismiss, ECF No. 29.  The motion is fully briefed and the court submitted it without oral argument.  *See* Opp'n, ECF No. 31; Reply, ECF No. 33; Minute Order, ECF No. 34.

## II.  LEGAL STANDARD

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  The motion may be granted only if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The court assumes all factual allegations are true and construes "them in the light most favorable to the nonmoving party." *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).  If the complaint's allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible. *Iqbal*, 556 U.S. at 678.  In the same vein, conclusory or formulaic recitations of elements do not alone suffice. *Id.* (quoting *Twombly*, 550 U.S. at 555).  This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense." *Id.* at 679.

These same standards apply to claims against municipal governments under § 1983. *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012). A plaintiff's allegations "may not simply recite the elements" of a claim under *Monell*. *See id.* (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). The complaint must "contain sufficient allegations of underlying facts to give fair notice" of the plaintiff's claims and allow the municipal government "to defend itself effectively." *Id.* (quoting *Starr*, 652 F.3d at 1216). The plaintiff's allegations "must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quoting *Starr*, 652 F.3d at 1216).

## III. ANALYSIS

Now, as before, Vacaville argues the complaint lacks factual allegations that, if true, could show it is liable under § 1983. To establish a municipality's liability under § 1983 and *Monell*, the plaintiff must ultimately prove a "policy or custom" deprived a person of a constitutional right. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc). The plaintiff must also show this policy or custom "reflects deliberate indifference to the constitutional rights" of the municipality's inhabitants. *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)). The policy, in other words, must reflect "a deliberate or conscious choice" among alternatives. *Canton*, 489 U.S. at 389 (quotation marks omitted).

Four types of policies or customs can support a claim against a municipal government under § 1983. First is an express policy: "a policy statement, ordinance, regulation, or decision officially adopted and promulgated." *Monell*, 436 U.S. at 690. The plaintiffs do not tie the policies or customs referenced in their complaint to any express statements or rules of this type.

Second, the Supreme Court has held that local governments can be liable under § 1983 for injuries caused by an official's decisions, even if not written or officially promulgated, but only if that official had "final policymaking authority" over "the action alleged to have caused the particular constitutional or statutory violation at issue." *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 (1997) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

/////

4

The plaintiffs do not allege that any official with final policymaking authority made a decision about the policies or customs listed in their complaint.

Third, relatedly, if "authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). The complaint also does not include allegations of this type.

This leaves the fourth category: custom and practice. The Supreme Court has held that "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). A few "isolated or sporadic incidents" are not enough to prove a city has an unconstitutional custom or practice. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). A practice or custom must have "sufficient duration, frequency and consistency" that it has "become a traditional method of carrying out policy." *Id.* "Proof of random acts or isolated events is insufficient to establish custom." *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995).

A "policy" of this fourth type can be a "policy of inaction." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Canton*, 489 U.S., at 395 (O'Connor, J., concurring in part and dissenting in part)). For example, in *Oviatt v. Pearce*, a sheriff knew that some of the inmates in the county jail were "mentally impaired, that some did not speak English and were unlikely to know of their legal rights, and that some inmates were not in contact with their families or lawyers." 954 F.2d 1470, 1476 (9th Cir. 1992). At least nineteen people had "sat in jail for periods of undetermined length after missed arraignments" over the past several years, but the Sheriff had adopted no procedures to keep track of people who missed court dates. *See id.* "The need for different procedures was so obvious that [the Sheriff's] adamant refusal to take action amounted to deliberate indifference to the detainees' constitutional rights." *Id.* at 1478; *see also Berry v. Baca*, 379 F.3d 764, 773 (9th Cir. 2004). The local government therefore was susceptible to a § 1983 claim based on a policy of inaction. *See Oviatt*, 954 F.2d at 1478. The result was the same in *Fairley v. Luman*, for example, when a police chief decided not to adopt

any procedures to prevent people from being detained on the wrong warrant. *See* 281 F.3d 913, 918 (9th Cir. 2002) (per curiam).

Another policy of inaction that can "serve as the basis for § 1983 liability" is a local government's failure to train its police force. *Canton*, 489 U.S. at 379. The failure to train must reflect a deliberate or conscious choice to disregard constitutional rights. *Id.* at 389–91. The Supreme Court also has emphasized that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. As a result, in most cases, a plaintiff must show that a local government's poorly trained employees repeatedly violated the constitutional rights of its citizens. *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997).

Here, the plaintiffs allege Vacaville had several customs and practices that amounted to unofficial policies, including policies of inaction and poor training. Many of these alleged policies are related to how police respond to people in mental health crises. For example, the plaintiffs allege Vacaville had a "policy to assign the nearest officer to respond to the scene involving a suspect dealing with a mental health crisis" regardless of whether the officer had training in how to respond to a mental health crisis. Second Am. Compl. ¶ 27. Plaintiffs allege the City allowed "its officers to physically engage the suspect having a mental health crisis without first having to take steps to de-escalate the situation." *Id.* ¶ 28. They allege the City has a "widespread or longstanding custom and practice of not providing assistance to individuals suffering from psychiatric or psychological problems." *Id.* ¶ 47. And they allege the City "did not adequately train its officers on how to engage with persons suffering from mental health crises for purposes of minimizing the use of force on such individuals." *Id.* ¶ 33.

Other policies described in the complaint are related to what Vacaville permits its police officers to do when they are restraining someone. The plaintiffs allege, for example, that the City allows "multiple officers to apply pressure on a suspect in order to cuff that person" even when the person is overweight or suffering from a mental health crisis. *Id.* ¶ 29. They allege the City has a policy to use a WRAP restraint on non-violent people. *Id.* ¶ 48. They allege the City did not adopt any rules "to prevent or minimize the risk of positional asphyxia," *id*. ¶ 30, especially

when officers use a WRAP restraint to restrain a person who is overweight, *id*. ¶ 29. And they allege the City "did not adequately train its officers against the dangers of positional asphyxia in connection with obese suspects placed in a prone position for long periods of time or in connection with the WRAP." *Id.* ¶ 32.

Although these allegations list several specific and relevant customs or practices, the complaint does not include factual claims that would be necessary to infer that the City's customs or practices are so "permanent" and "well settled" that they carry the "force of law." *Praprotnik*, 485 U.S. at 127 (quoting *Adickes*, 398 U.S. at 167–68). Factual allegations such as these are necessary to "plausibly suggest an entitlement to relief." *Hernandez*, 666 F.3d at 637 (quoting *Starr*, 652 F.3d at 1216). The plaintiffs do not allege, for example, that the City has often sent untrained officers to intervene when people are suffering from mental health crises. Nor does the complaint list examples of the City's officers' using restrains in a way that led to a tragedy like the one that befell Yasko and his family. As it stands, the complaint admits only the possibility that Yasko's death was not an "isolated or sporadic" tragedy. *Trevino*, 99 F.3d at 918. A possibility is not enough under the Supreme Court's decisions in *Iqbal* and *Twombly*. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

In arguing that Vacaville has an unconstitutional custom or practice, the plaintiffs lean heavily on their allegation that "[b]ecause police departments regularly deal with persons suffering from a mental health crisis, . . . police departments across the United States have developed protocols to follow during such calls for service." *See* Second Am. Compl. ¶ 25. If proven, these allegations could show the need for a policy was obvious. But they would not show Vacaville actually had a particular practice. Nor would they show this practice was adopted or enforced with disregard to the rights of people in the midst of mental health crises. These are essential elements of a § 1983 claim against a municipality. *See, e.g.*, *Canton*, 489 U.S. at 388.

The same is true of the plaintiffs' argument that when the Vacaville police were kneeling on Yasko's back that night, officers in other cities and counties had often been "held liable for causing the death of subjects by placing too much weight on their torsos while prone." Opp'n at 7. The senselessness of what the City's police allegedly did is beyond debate. *See Drummond*

7

*ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th Cir. 2003) ("The officers allegedly crushed Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance. *Any* reasonable officer should have known that such conduct constituted the use of excessive force." (emphasis in original)). But it is the City of Vacaville has moved to dismiss; its officers have not. And binding authority requires "allegations of underlying facts" about the City's customs and practices before the court can draw inferences about the City's liability for a longstanding or widespread custom or practice. *Hernandez*, 666 F.3d at 637 (quoting *Starr*, 652 F.3d at 1216).

That said, factual allegations about a pattern of similar violations are not always necessary to support a *Monell* claim. The "unconstitutional consequences" of inaction "could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. This is true only "in a narrow range of circumstances." *Id.* at 63 (quoting *Bryan Cnty.*, 520 U.S. at 409). The consequences of inaction must be "highly predictable" and "obvious." *Bryan Cnty.*, 520 U.S. at 409. The failure must also have "led directly to the very consequence that was so predictable." *Id.* at 409–10. Causation in the "but for" sense is not enough. *See id.* The Ninth Circuit also has suggested that the consequences of poor policies must be obviously dire, for example, if employees are "making life-threatening decisions." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1155 (9th Cir. 2021); *see also, e.g.*, *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1189 (9th Cir. 2006) (medical care). But the Circuit's decisions are not limited to life-or-death scenarios. *See, e.g.*, *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 794, 796–97 (9th Cir. 2016) (en banc) (removing children from their homes); *Lee v. City of Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2001) (extraditing mentally incapacitated people).

When the Supreme Court first held that a single incident might support a poor training claim, it offered an example of a claim that might ultimately succeed: "a single incident of excessive force, coupled with evidence that a city had neglected to train its armed officers on the constitutional limitations on using force against fleeing felons, might establish that the city

8

manifested deliberate indifference in training law enforcement." *Kirkpatrick*, 843 F.3d at 794 (citing *Canton*, 489 U.S. at 390 n.10). Since then, the Supreme Court has held that a district attorney's office is not liable under § 1983 for failing to train its prosecutors about the disclosure requirements of *Brady v. Maryland* if all the plaintiff alleges is that those prosecutors wrongly withheld exculpatory evidence in one case. *See Connick*, 563 U.S. at 63–68 (citing 373 U.S. 83 (1963)). Because attorneys receive extensive post-graduate education, take licensing exams, are subject to ethical rules, must satisfy continuing education requirements, and are "familiar" with *Brady*, it is not "obvious" that prosecutors will violate *Brady v. Maryland* if the training they receive from their local government employer is inadequate. *See id.* The Court also has held that a county was not liable under § 1983 for hiring an officer with a history of assault, battery, resisting arrest, and public drunkenness when the plaintiffs, who asserted claims of excessive force, did not cite other excessive uses of force by officers with similarly checkered histories. *See Bryan Cnty.*, 520 U.S. at 409–15. It was not "obvious" that hiring an officer with a questionable background like this would lead to excessive force, even if problems would be "more likely." *See id.* at 410–11 (emphasis omitted).

The plaintiffs' allegations here show this action is one of the rare cases in which a local government's deliberate indifference may be inferred without allegations about a pattern of similar violations. The allegations permit an inference of liability based on two types of deliberately indifferent policy choices.

***First***, according to the complaint, the Vacaville Police Department regularly receives "calls for assistance in connection with persons undergoing a mental health crisis" and, like other police departments, is on "the front lines in dealing with mental health problems." *Id.* ¶ 23. Unlike these other Police Departments, however, Vacaville does not assign specially trained officers to respond to calls about people undergoing mental health crises. *Id.* ¶ 25. Instead, the plaintiffs say, the City had no policy at all "for dealing with suspects suffering from mental health crises"; instead it sent untrained officers. *Id.* ¶ 27. They allege, for example, that the City permitted its officers to "physically engage" a person in a mental health crisis without first attempting to "de-escalate the situation." *Id.* ¶ 28.

These allegations paint a plausible picture of deliberate indifference to the constitutional rights of people suffering from mental health crises. Police officers are usually not mental health experts. Nor can officers be expected to perform the duties of social workers or emergency medical technicians. They cannot be expected to know what to do when they meet someone in crisis, especially someone who is a danger to himself, to the police, or to others, as the plaintiffs allege Yasko was here. When a person is injured, behaving erratically, and has recently attempted suicide, an officer's decisions may mean the difference between life and death. If the City truly has no policy to train its armed officers on what to do in these situations, as the court must assume at this stage, it is plausible to infer that plaintiffs could prove Vacaville was deliberately indifferent. Serious injuries and death are the obvious and highly predictable consequences of sending untrained and armed officers to respond to mental health crises. *See, e.g.*, *Kirby v. City of E. Wenatchee*, No. 12-0190, 2013 WL 1497343, at *14 (E.D. Wash. Apr. 10, 2013) (denying summary judgment given "large body of municipal liability jurisprudence shedding light on the issue of deliberate indifference in the context of tragic encounters between police officers and mentally ill individuals"); *Dorger v. City of Napa*, No. 12-440, 2012 WL 3791447, at *4 (N.D. Cal. Aug. 31, 2012) (denying motion to dismiss based on allegations of city's "failure to train officers who might come into contact with individuals in mental health crisis or otherwise diminished mental capacity"); *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 814 F. Supp. 2d 967, 978 (E.D. Cal. 2011) ("[T]he failure to have *any* continuing education training on handling mentally ill people and the failure to address the issue *at all* in the police manual creates at least triable issues with respect to whether [the local government's] failure to train amounted to deliberate indifference . . . ." (emphases in original)).

**Second**, the complaint permits a plausible inference that Vacaville is liable for having no policy about how officers may apply their bodyweight to the back of a person lying prone on the ground. *See* Second Am. Compl. ¶ 29. Officers cannot reasonably be expected to understand the dangers of "positional asphyxia" without any training. *See id.* ¶ 30. The plaintiffs allege those dangers are acute when, as here, the person is overweight, handcuffed, and restrained in a WRAP device. *See id.* ¶¶ 29–30.

These allegations are a close analogy to the Supreme Court's hypothetical in *Canton*. When inferences are drawn in the plaintiffs' favor, as again they must be here, it is plausible to conclude that Vacaville knows "to a moral certainty" its officers will be required to restrain people. *See* 489 U.S. at 390 n.10. Officers are likely to use their bodyweight along with the handcuffs and WRAP restraints the City arms them with "to allow them to accomplish this task." *Id.* Police are likely to encounter some suspects with health conditions, such as their weight, that put them at greater risk of injury or death, so the force in question may be lethal. *See id.* As a result, "the need to train officers in the constitutional limitations on the use of deadly force" in these circumstances "can be said to be so obvious that the failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Id.* (quotation marks omitted). Similar allegations and evidence have supported "single incident" claims like those the plaintiffs assert here. *See, e.g.*, *Briones v. City of Ontario*, No. 17-0590, 2018 WL 6017037, at *11 (C.D. Cal. May 21, 2018) (denying summary judgment of similar claims based on single incident and local government's policies on dangers of positional asphyxia).

Both of Vacaville's alleged policies also satisfy the relevant causation standard, i.e., "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Castro*, 833 F.3d at 1075 (quoting *Canton,* 489 U.S. at 385). If the City had trained its officers "to not escalate the situation, to avoid using physical force, to not rush the situation . . . , to keep a safe distance . . . , and, if necessary, to reach out to mental health professionals," as the plaintiffs allege it should have, Second Am. Compl. ¶ 26, then officers would not have immediately placed their weight on Yasko's back and restrained him in a WRAP restraint. And if the Vacaville had trained its officers how to use handcuffs and the WRAP restraint safely on an overweight subject, as the plaintiffs allege it should have, *see id.* ¶¶ 29–30, then Yasko would not have asphyxiated.

/////

/////

/////

## IV. CONCLUSION

The motion to dismiss is **denied**. Responsive pleadings must be filed **within twenty-one days**. This order resolves ECF No. 29.

IT IS SO ORDERED.

DATED: October 22, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE