Richard W. Osman, State Bar No. 167993
Sheila D. Crawford, State Bar No. 278292
Corey C. Wilson, State Bar No. 332800
BERTRAND, FOX, ELLIOT, OSMAN & WENZEL
The Waterfront Building
2749 Hyde Street
San Francisco, California 94109
Telephone: (415) 353-0999
Facsimile: (415) 353-0990
Email: rosman@bfesf.com
          scrawford@bfesf.com
          cwilson@bfesf.com

Attorneys for Defendants
CITY OF VACAVILLE, JULIE BAILEY,
CHUCK BAILEY, DUSTIN WILLIS AND
DAVE SPENCER

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARMEL GARCIA, an individual; M.Y. AND L.Y., minors by and through their guardian ad litem VANESSA RUIZ; L.Y., a minor by and through his guardian ad litem FRANCISCA URIOSTEGUI,<br><br>        Plaintiff,<br><br>v.<br><br>YUBA COUNTY SHERIFF'S DEPARTMENT; YUBA COUNTY SHERIFF'S DEPUTIES DOES 1-5; CITY OF VACAVILLE; and VACAVILLE POLICE OFFICER DOES 6-10;<br><br>        Defendants. | Case No. 2:19-cv-02621-KJM-DB<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br>**[FRCP RULE 56]**<br><br><br><br>Date:   November 4, 2022<br>Time:   10:00 a.m.<br>Place: Zoom Webinar<br><br><br><br>Judge: Kimberly J. Mueller |

# **TABLE OF CONTENTS**

NOTICE ...................................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................1

I.      SUMMARY OF ARGUMENT AND STATEMENT OF ISSUES TO BE DECIDED ....................1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................2

        A.      Facts Leading Up To Incident....................................................................2

        B.      The Incident ................................................................................................3

        C.      City Training and Policies .......................................................................10

III.    LEGAL ARGUMENT...............................................................................................11

        A.      Summary Judgment is Proper in This Case ............................................11

        B.      Plaintiffs' §1983 Claim for Violation of Decedent's Fourth Amendment Rights is Meritless .................................................................................................12

        C.      Plaintiffs' Claim For Violation Of Their Fourteenth Amendment Rights Is Meritless....................................................................................................14

        D.      The Officers Are Entitled to Qualified Immunity....................................16

        E.      The Third Cause of Action for §1983 *Monell* Liability is Meritless .....18

                1.      No Evidence Supports A Claim Based On A Pattern, Policy Or Custom .................19

                2.      Plaintiffs' Inadequate Training Claim Is Unsupportable..........................19

IV.     CONCLUSION .......................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Aguilera v. Baca,*
   510 F.3d 1161 (9th Cir. 2007) ........................................................................................ 19

*Ashcroft v. al-Kidd*
   563 U.S. 731 (2011) ....................................................................................................... 16

*Bd. of the Cnty. Comm'rs. of Bryan Cnty. v. Brown,*
   520 U.S. 397 (1996) ....................................................................................................... 19

*Brosseau v. Haugen*
   543 U.S. 194 (2004) ................................................................................................. 16, 17

*Castro v. Cnty. of L.A.,*
   833 F.3d 1060 (9th Cir. 2016) ...................................................................................... 19

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ....................................................................................................... 11

*City and Cnty of San Francisco v. Sheehan*
   135 S.Ct. 1765 (2015) ................................................................................................... 16

*City of Canton v. Harris,*
   489 U.S. 378 (1989) ........................................................................................... 18, 19, 20

*City of Escondido v. Emmons*
   139 S.Ct. 500 (2019) ..................................................................................................... 17

*City of Los Angeles v. Heller,*
   475 U.S. 796 (1986) ....................................................................................................... 19

*City of St. Louis v. Praprotnik,*
   485 U.S. 112 (1988) ....................................................................................................... 18

*Cnty. of Los Angeles v. Mendez*
   137 S.Ct. 1539 (2017) ................................................................................................... 12

*Connick v. Thompson,*
   563 U.S. 51 (2011) ................................................................................................... 18, 19

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ....................................................................................................... 15

*First Nat'l Bank v. Cities Serv. Co.,*
   391 U.S. 253 (1968) ....................................................................................................... 12

*Gausvik v. Perez,*
   392 F.3d 1006 (9th Cir. 2004) ...................................................................................... 14

*Graham v. Connor*
   490 U.S. 386 (1989) ....................................................................................................... 12

*Hunter v. Bryant*
  502 U.S. 224 (1991) ..................................................................................16

*Kisela v. Hughes*
  138 S.Ct. 1148 (2018) ...............................................................................17

*Lee v. City of Los Angeles,*
  250 F.3d 668 (9th Cir. 2001) .....................................................................14

*Maag v. Wessler*
  960 F.2d 773 (9th Cir. 1991) .....................................................................16

*Mattos v. Agarano*
  661 F.3d 433 (9th Cir. 2011) ...............................................................12, 16

*Monell v. Dept. of Social Services,*
  436 U.S. 658 (1978) ..................................................................................18

*Monzon v. City of Murrieta*
  978 F.3d 1150 (9th Cir. 2020) ...................................................................12

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*
  210 F.3d 1099 (9th Cir. 2000) ...................................................................12

*Pearson v. Callahan*
  555 U.S. 223 (2009) ..................................................................................16

*Pembaur v. City of Cincinnati,*
  475 U.S. 469 (1986) ..................................................................................19

*Plumeau v. Sch. Dist. #40 Cnty. of Yamhill,*
  130 F.3d 432 (9th Cir. 1997) .....................................................................19

*Plumhoff v. Rickard*
  572 U.S. 765 (2014) ..................................................................................12

*Porter v. Osborn,*
  546 F.3d 1131 (9th Cir. 2008) ...................................................................15

*Reese v. Cnty. of Sacramento*
  888 F.3d 1030 (9th Cir. 2018) ..............................................................16, 17

*Reichle v. Howards*
  566 U.S. 658 (2012) ..................................................................................16

*Saucier v. Katz*
  533 U.S. 194 (2001) ............................................................................12, 16

*T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n,*
  809 F.2d 626 (9th Cir. 1987) .....................................................................11

*Tennessee v. Garner*
  471 U.S. 1 (1985) ......................................................................................12

*White v. Pauly*
  137 S.Ct. 548 (2017) .................................................................................17

**Rules**

42 U.S.C. §1983.................................................................................................................1

## NOTICE

TO PLAINTIFFS AND THEIR ATTORNEYS-OF-RECORD: PLEASE TAKE NOTICE that on November 4, 2022, at 10:00 a.m., defendants City of Vacaville, Julie Bailey, Chuck Bailey, Dustin Willis and Dave Spencer will and hereby do move this Court for an order granting summary judgment or, alternatively, partial summary judgment in favor of Defendants and against Plaintiffs. This motion is brought pursuant to Federal Rules of Civil Procedure, Rule 56, as set forth more fully in the Memorandum of Points and Authorities below, on the grounds that summary judgment is warranted because the uncontroverted evidence establishes that: 1) the officers' use of force was objectively reasonable and lawful; 2) plaintiffs' claim for violation of the rights to familial association are unsupportable; 3) the officers are entitled to qualified immunity; and 4) the *Monell* claim against the City is unsupportable. Defense counsel attempted to meet and confer with Plaintiffs' counsel, but despite making multiple attempts, telephone calls were not answered and both lawyers' voicemail boxes were full.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. SUMMARY OF ARGUMENT AND STATEMENT OF ISSUES TO BE DECIDED

Plaintiffs Carmel Garcia, an individual; M.Y. and L.Y., minors by and through their guardian ad litem Vanessa Ruiz; L.Y., a minor by and through his guardian ad litem Francisco Uriostegui (collectively, "Plaintiffs"), in their individual capacities, and on behalf of Decedent Samuel Levi Yasko ("Decedent") as his successors in interest, bring this action against Defendants City of Vacaville (the "City"), Julie Bailey ("JB"), Chuck Bailey ("CB"), Dustin Willis ("DW") and Dave Spencer ("DS") for violation of Decedent's Fourth Amendment rights, violation of Plaintiffs' Fourteenth Amendment Rights to familial association and for *Monell* municipal liability under 42 U.S.C. §1983 arising out of an incident on December 29, 2017. Plaintiffs claim the officers used excessive force by applying their body weight to stop Decedent from struggling and resisting their efforts to handcuff him to investigate reports he was fighting and/or suicidal, and in allowing him to remain in a prone position for under a minute after he was handcuffed and no longer appeared to be physically struggling and resisting. The undisputed evidence establishes that the officers' actions were objectively reasonable under the totality of circumstances and lawful, and the officers are entitled to qualified immunity, as Plaintiffs cannot meet their burden to show factually similar authority that "squarely governs" and prohibited the officers' conduct under the particular facts of this case. Plaintiffs'

*Monell* claim against the City also is unsupportable and meritless. Summary judgment, or alternatively, partial summary judgment, should be granted in favor of Defendants.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Facts Leading Up To Incident

On December 28, 2017, the day before the incident, Decedent was released from jail. (Sturgeon Depo. 26:19-27:4.) The following day, he went to his brother Joseph Sturgeon's ("Sturgeon") jobsite at a residential home. He told Sturgeon he was very high from taking methamphetamine, which Sturgeon knew was an ongoing problem for him, and it appeared to Sturgeon that Decedent was under the influence. (*Id*. 30:5-31:10, 34:22-35:14, 38:3-8, 39:1-23, 41:6-43:3, 104:6-14.) Sturgeon took Decedent to the store to get food and water and they smoked cannabis together at about 2:30 p.m. to counteract the narcotics and calm Decedent. (*Id*. 42:8-16, 105:1-106:8.) Decedent took a grinder machine and moved it towards his wrist and Sturgeon grabbed it away and told their friend Jason Hays ("Hays") to watch Decedent. (*Id*. 44:18-45:17.) When Sturgeon went downstairs around 3:30 or 4:00 p.m. he saw Decedent half in a car with scrapes on his head and body. Hays said Decedent jumped head-first off the second or third story and hit his head on the asphalt 20 feet below. Decedent told Sturgeon it was a leap of faith, he appeared incoherent and did not know where he was, and he said they brought him to a safe place to be with God. (*Id*. 45:18-47:3, 50:7-51:9, 108:15-18, 109:2-8.) Sturgeon and Hays tried to pick Decedent up to put him in the truck to leave and they struggled with him on the ground for 30 minutes trying to get him to stay in the truck. Decedent managed to "barrel past" Sturgeon and run back into the house and Sturgeon was afraid he would cause damage. (*Id*. 52:3-53:3.) Decedent ran around the house, slammed into walls and talked about "weird stuff" like demons, heaven and hell and said they brought him to a good place for him to pass. (*Id*. 54:6-55:3, 114:25-116:2.) Decedent drank some beer, ran further in the house, head-butted Sturgeon twice and punched him three times when he tried to stop him and he wrestled with Sturgeon, causing Decedent to throw up. (*Id*. 55:4-56:15, 56:16-57:7, 112:1-17.) Sturgeon decided to tie Decedent's hands and feet and move him to the truck on a furniture cart. (*Id*. 57:16-20, 59:21-23.) Decedent resisted being tied, and given his large size, he did not need to move much to resist being restrained. (*Id*. 58:14-21.) Sturgeon managed to tie Decedent and get him in the backseat of the truck, where he untied him. (*Id*. 59:24-61:18.)

As Sturgeon drove, Decedent grabbed the steering wheel and yanked it to the right, causing the car to cross three lanes of the highway. Sturgeon bit Decedent to get him to release the steering wheel. (Id. 61:19-62:22, 63:23-65:1, 130:9-131:10.) Sturgeon then stopped the vehicle and Decedent agreed to have his hands tied so they could continue driving. (Id. 66:14-18.) His hands were later untied and he wrapped the seatbelt around his neck multiple times, resulting in him losing consciousness and making gurgling noises. (Id. 67:6-9, 67:22-68:3, 122:22-124:19.) Sturgeon drove to an AM/PM service station and stopped and then cut the seatbelt with a knife and Decedent resumed breathing. (Id. 69:7-70:18.) Decedent then used anything he could find in the truck to wrap around his neck and pull it tight while Sturgeon struggled to stop him. (Id.70:24-73:12.) They exited the car and Decedent fell to the ground with his pants down at his ankles. It seemed to Sturgeon that Decedent was not himself and on "autopilot." (Id. 73:13-75:22, 79:9-80:6.) Decedent repeatedly said "help me," and again started wrestling with Sturgeon. Sturgeon and Decedent yelled and fought in the parking lot and Sturgeon told Hays to call for help. (Id. 75:23-76:13, 76:23-78:2.)

**B.    The Incident**

On December 29, 2017, JB was on duty in the City of Vacaville dressed in her patrol uniform with a body-worn camera mounted to the front of her vest, and she carried a WRAP restraint device in her squad car. (JB Depo. 52:20-53:5, 55:2-22, 66:12-14, 71:8-12, 83:6-85:12, 86:22-25; CB Depo. 150:9-2.) As she was on patrol, she saw a truck parked at the AM/PM gas station convenience store with one of the truck's doors open and a black male with long braids or dreadlocks and a work vest standing in the open door area. The subject made eye contact with JB and she felt something unusual was occurring because the location was a convenience store gas station parking lot where people do not generally linger, but rather, quickly do their business and leave. (JB Depo. 75:19-77:4.) JB pulled into the parking lot behind the AM/PM and stopped where the truck was still in her view. She confirmed the truck was not stolen and had no warrants. She observed the truck for about five minutes and she saw nothing wrong with the situation so she exited the parking lot. (JB Depo. 77:18-78:2.)

As JB existed the parking lot, at around 8:00 p.m., dispatch advised officers to respond to a reported fight in progress at 310 Orange Drive. (JB Depo. 74:23-75:9; CB Depo. 128:22-129:2; DW Depo. 50:5-16; DS Depo. 12:11-16, 55:17-56:25.) The reported location was the same AM/PM JB just

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

left seconds earlier, and she made a u-turn and drove back to the AM/PM. (JB Depo. 75:10-18, 78:3-10.) JB pulled into the parking lot and saw a man flagging her down. The man pointed out the white truck she observed earlier and he said it looked like people there were beating up a man who was lying on the ground. (JB Depo. 79:3-16.) Dispatch simultaneously advised that another caller reported that they were trying to stop a man at the same location from killing himself. (JB Depo. 79:17-80:11; CB Depo. 129:11-16, 183:5-24.) JB requested cover officers to respond Code 3 with lights and sirens as she drove in the parking lot toward the white truck. (JB Depo. 80:12-19; CB Depo. 129:20-130:7.)

JB saw the truck parked near a dumpster enclosure consisting of a dumpster surrounded on three sides by a brick wall. She recognized the truck parked next to the dumpster as the same white truck she observed earlier, and she saw the same black male she saw earlier (later identified as Hays) standing at the rear bumper between the truck and the dumpster on the driver's side, close to the wall. (JB Depo. 80:23-82:5, 93:14-21; JB BWC 0:35-40.) She saw another man near the driver's door, later identified as Sturgeon. (JB Depo. 82:6-11, 93:22-25.) JB parked her vehicle and exited, and immediately observed Hays talking on a cell phone in an elevated manner, and it sounded as if he was speaking to the police dispatcher and a man that was on the ground between the dumpster and the truck. (JB Depo. 82:12-25, 87:15-88:6; Sturgeon Depo. 164:4-13.) Hays appeared to be excitedly trying to talk to JB while on the cell phone, sharing information with whomever he was speaking with on the phone. (JB Depo. 88:13-23.)

The situation was very dynamic and JB observed multiple people moving about the area. Radio traffic continued to be broadcast and she tried to listen to the information from dispatch and figure out where her cover officers were located, while her primary focus was on Hays and Sturgeon and the third man on the ground. The man on the ground, later identified as Decedent, was on his stomach and he was shirtless, with his pants down and partially covering his buttocks. He appeared to be speaking but JB could not understand him or hear what he was saying because of all the other noise in the area. JB believed Decedent was either the victim of a battery or was trying to kill himself, depending on the varying information callers provided to dispatch. (JB Depo. 88:24-90:19, 100:13-20.) Hays motioned to Decedent and told JB he was trying to stop Decedent from killing himself. JB walked towards Decedent to help him as Hays and Sturgeon moved from their position near Decedent's head to near his abdomen, inadvertently obstructing her access to Decedent. (JB Depo. 90:20-92:9)

As JB approached Decedent, he rose up to a kneeling position as if he was going to stand up and he was face-to-face with JB. JB repeatedly ordered him to "Get down on the ground. Stay on the ground. Stay down." (JB Depo. 92:10-15, 94:3-13, 94:18-24, 101:4-7; JB BWC 0:41-53.) JB saw that Decedent had a large knot on his forehead area approximately 3 inches in diameter and protruding from his head, and Hays said the knot was caused when Decedent jumped or fell from a two-story building earlier that day while trying to commit suicide. (JB Depo. 145:25-146:15; DS Depo. 56:4-9, 62:6-17, 117:19-25.) Decedent got back down on the ground and Hays repeatedly told Decedent to get down and "Don't resist," but he did not get down without Hays and Sturgeon physically forcing him down. (JB Depo. 92:10-18, 94:18-95:3, 100:21-101:3.) Hays pulled Decedent's arms out so he could not stop himself from going to the ground on his abdomen and Sturgeon pushed his back down with his hands until they maneuvered Decedent into a flattened position on the ground. (JB Depo. 95:4-16.) Decedent did not react violently towards anyone but he physically resisted Hays and Sturgeon's efforts to move him down to the ground. (JB Depo. 96:14-19.) Hays and Sturgeon remained on top of Decedent after they forced him into the prone position. (JB Depo. 101:8-17.) JB told Hays to remain on Decedent and she said that if Decedent started to physically fight, she would have to tase him. (JB Depo. 101:18-25.) Hays and Sturgeon remained on Decedent for less than a minute before getting off of him. (JB Depo. 104:6-11.)

The truck was parallel to the wall of the dumpster enclosure and Decedent was parallel to the truck between the truck and the wall in a prone position on the ground with his head facing north towards the rear bumper of the car. (JB Depo. 98:4-25, 99"19-21.) JB moved to stand between Decedent and the wall of the dumpster, towards his back. (JB Depo. 98:4-11.) JB had her Taser drawn and on and she tried to get information from Hays and Sturgeon and gave commands to Decedent to stay down on the ground to deescalate the situation as she waited for cover offers to arrive. (JB Depo. 99:22-100:12.) Sturgeon requested JB's handcuffs to handcuff Decedent, which she did not provide, as she was still trying to gather information from Sturgeon and Hays while trying to subdue Decedent and prevent him from fighting, and she did not yet know whether handcuffing him was warranted. (JB Depo. 104:12-105:8.)

Officer CB, Sgt. Spencer ("DS") and Cpl. Willis ("DW") arrived on scene at different times to assist JB. (JB Depo. 104:14-105:8, 106:4-6, 107:4-20; CB Depo. 127:12-19, 130:14-18, 146:12-16; DW Depo. 52:8-17; DS Depo 12:11-16.) The scene was semi-busy with cars at the gas pumps, numerous

people in the area and people going in and out of the convenience store. (DW Depo. 53:14-54:7.) The officers had information from dispatch that a physical fight was occurring and that people were trying to restrain a suicidal subject, and officers did not yet know what the situation was, as it could be myriad situations that may not even have been mentioned. (CB Depo. 131:6-23, 149:11-150:8; DW Depo. 58:6-20; DS Depo. 11-16.) Decedent was still lying on the ground between the truck and the wall. (DW Depo. 54:8-21.) Sturgeon was on Decedent's back and Sturgeon and Hays were yelling at him to calm down, don't fight and stop resisting as they tried to force his hands behind his back. Sturgeon and Hays were untrained in handcuffing and they forcefully moved his arms in a way that could injure him and they were ordered to stop, prompting Hays and Sturgeon to move away. (JB Depo. 105:9-24; CB Depo. 132:12-133:2, 134:5-135:12, 136:4-15.)

The space between the truck and dumpster wall was less than two feet wide and very tight, and only CB, DW and JB were able to fit into the space. (JB Depo. 107:21-108:4, 110:18-22; CB Depo. 133:15-18.) Based on the partial information JB had, it appeared that Decedent was in some sort of mental distress and she believed he should be detained to prevent him from fighting his friends, fighting the officers or endangering himself. (JB Depo. 145:7-15.) JB had not yet investigated the situation and she did not know the cause of his mental distress and whether it was caused from narcotic use, a mental health condition or a physical health problem. (JB Depo. 145:16-24.) JB believed Decedent may ben under the influence of a narcotic substance, and given reports that he was trying to kill himself, officers sought to handcuff him to restrain him so he would not harm or kill himself. (JB Depo. 143:24-144:11; DS Depo. 60:18-25.) DW Willis also believed Decedent was displaying "pre-assaultive" behavior and that he would hurt himself or the officers if he was not restrained in handcuffs, particularly given that he reportedly was suicidal. (DW Depo. 59:7-60:12; DS Depo. 58:12-60:17.) Decedent's reported suicide attempts concerned Spencer because officers are trained that suicidal people are more desperate. (DS Depo. 56:10-57:21.) The officers had no opportunity to attempt de-escalation techniques because Decedent's behavior posed an imminent threat of violence and their main concern was to get Decedent under control and into a position of safety so he could not hurt himself or others. (DS Depo. 59:3-13.)

Hays previously told JB that Decedent did not use a weapon to attempt suicide and JB did not believe Decedent was armed. (JB Depo. 113:13-22.) CB heard JB mention Decedent's waistband but did

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

not know whether it meant he was unarmed and CB and Willis did not know whether Decedent had any weapons. (CB Depo. 140:8-17, 140:22-141:3; DW Depo. 95:23-96:11.) JB was facing Decedent's head and she bent to a kneeling position with her legs straddling either side of Decedent's thighs or buttocks so that she was kneeling over him and not sitting on him or physically applying pressure on him. (JB Depo. 108:14-109:10; DW Depo. 54:22-55:9, 55:22-56:5.) Decedent was large in stature and strong, and he tried to stand up, refused to put his hands behind his back and kept pulling his arms away, and his whole body was rigid and tense. (JB Depo. 108:10-13, 111:11-17; CB Depo. 135:5-12; DS Depo. 21:6-25, 25:17-26:10.) Decedent was combative, physically pulling away, twisting his body, keeping his hands under his torso, physically resisting efforts to pull his arms back, resisting being handcuffed and not complying with orders. (JB Depo. 125:13-126:1; DW Depo. 55:10-15, 58:21-59:6, 64:2-5; DS Depo. 78:4-25.) Sturgeon told Decedent the officers were there to help, but Decedent continued struggling. (Sturgeon Depo. 84:7-25.) Willis believed that if they let go of Decedent he would try to flee or hurt the officers or himself. (DW Depo. 66:17-67:3.) JB leaned forward and used two hands to try to move Decedent's right arm from under his torso to secure his hands in handcuffs behind his back but he kept pulling his right arm away from the officers. (JB Depo. 109:11-20, 111:18-112:1.)

CB kneeled near Decedent's head with one knee on the ground and his right knee on Yasko's left shoulder to prevent him from actively getting up as he tried to get Decedent's right hand behind his back. Decedent continued moving and tensing his whole body and he was able to lift CB. (JB Depo. 109:21-110:13, 111:8-10; CB Depo. 141:19-142:8, 142:21-143:9, 144:18-24, 152:8-153:8, 153:14-24; DW Depo. 56:11-18, 95:5-22.) As Decedent struggled, CB's weight shifted so that his weight was on his knee that was on the ground and not on Decedent, and when Decedent tried to lift up CB used his right knee to push him down. (CB Depo. 143:15-24.) Willis stood in the narrow space with his back to the dumpster wall facing JB and CB and he had his taser out for a less lethal option if needed. (JB Depo. 110:14-22; DW Depo. 96:16-97:17.) Decedent did not say any words and just yelled like he was angry and made grunting noises but he did not sound like he was winded or having agonal breathing. (JB Depo. 112:14-16; CB Depo. 140:22-141:6, 150:19-152:7, 166:10-13; DW Depo. 93:9-94:19.)

The officers managed to get one handcuff on Decedent's right hand, but he continued moving and pulling away and his left hand remained under the left side of his torso. The officers struggled to pull his

left arm out from under him and back behind his back while simultaneously ordering him to give them his hand, but he did not comply and kept pulling away. (JB Depo. 112:17-118:4; CB Depo. 141:4-6, 154:4-9, 155:4-7; DW Depo. 95:5-22; DS Depo. 21:6-25.) Spencer saw Decedent had one handcuff on and he was struggling with JB and CB as they tried to handcuff him. (DS Depo. 12:17-14:3, 18:17-25, 21:6-25, DS Depo. 36:17-37:13, 105:22-106:10.)  The officers still did not know whether Decedent was armed or why he kept his hand under his torso and refused to comply with orders to bring his hand out from under him. (DS Depo. 21:6-22:3.) Given Decedent's size, he was not secured in handcuffs, continued to struggle and was a threat to offer safety, Spencer delivered knee strikes to his side or back to try to gain his compliance. (DS Depo. 64:19-65:493:13-19, 94:13-20, 95:12-18, 96:3-97:2.)

Decedent was so big that it took officers longer than usual to get his arm out from under him and behind him to cuff his hands while he was actively resisting. (JB Depo. 110:23-111:7, 112:2-10, 115:1-25; DS Depo. 24:23-25:16.) Willis rested the top of his foot on Decedent's shoulder to prevent him rolling over in case he tried to roll, but Willis otherwise kept all his weight on the wall. (DW Depo. 97:18-98:18, 99:1-20, 100:11-101:4; DS Depo. 38:6-39:5, 39:18-40:11, 43:24-44:11.) Decedent continued tensing his muscles and the officers decided to use two sets of handcuffs to cuff him because of his large stature. (CB Depo. 156:15-157:5, 157:16-24; DS Depo. 26:18-28:11.)

Decedent's left hand finally was cuffed approximately 30 seconds after his right hand was cuffed. (JB Depo. 113:2-7; CB Depo. 157:25-158:2.) Decedent remained in a prone position on the ground and he continued moving and tensing his body, making verbal noises and actively resisting for approximately 30 seconds. (JB Depo. 113:23-114:8; CB Depo. 161:25-162:18; DS Depo. 46:15-47:8.) JB had moved backwards, straddled over Decedent's lower legs and she relayed to Spencer the information she had about the incident, while CB briefly continued to keep his knee on Decedent to remain prepared for what Decedent might do next to ensure he did not hurt himself or anyone else. (JB Depo. 114:9-21; DS Depo. 40:19-41:16, 42:1-15.) Willis kept his foot against Decedent's elbow area to maintain control of his arms because handcuffed suspects can still threaten officer safety, particularly when two sets of cuffs are used as it allows a subject's arms to be farther apart and a subject may swing their arms and elbows to strike officers, and officers are taught that elbows are significant striking tools (DW Depo. 119:18-120:24; CB estimates that his knee was on Decedent's shoulder for a total of about 1 minute. (CB Depo. 144:8-17,

160:1-5.) Spencer did not assist in handcuffing Decedent and he went to get a WRAP device as soon as Decedent was handcuffed. (CB Depo. 146:12-19; DS Depo. 44:24-45:10, 77:9-21.)

Decedent was not placed on his side right after he was handcuffed because officers were assessing the situation and intended to use a WRAP, which is used for safety reasons when someone is combative to prevent them from kicking and injuring themselves or others and to allow a subject to be put into an upright position. Decedent continued to move about, lifting his head off the pavement and making grunting and growling noises and the officers wanted to prevent him from biting or spitting on the officers or from getting up and fleeing the scene  (JB Depo. 120:20-121:7, 124:19-125:12, 126:4-8; CB Depo. 158:9-23, 161:25-162:22, 175:24-176:5, 175:13-21, 177:11-178:9, 179:2-9; DS Depo. 29:19-24, 43:24-44:11, 45:22-25, 74:1-75:10, 77:2-8.) The officers had spent over two and a half minutes wrestling Decedent to get his hands behind his back. (JB BWC 1:48-4:11) Due to his level of resistance, the officers were concerned about what he might do once they stood him up. (DS Depo. 78:4-17, 78:19-25, 112:5-20.) Decedent continued to make verbal noises and move after he was secured in handcuffs. (JB BWC 5:10-5:11 and 6:13-6:16). Spencer brought the WRAP and they prepared to put it on Decedent's ankles. (DS Depo. 84:25-85:09; JB BWC 5:45-6:19). Approximately one minute after Decedent was handcuffed, officers noticed that Decedent's ankles were tied together with a pink tie, and later discovered it was done by Hays or Sturgeon. (DW Depo. 101:20-102:12; DS Depo. 42:16-43:7, 45:11-21.) Decedent still posed a threat to officers and himself even with his ankles tied because he could still move his upper body and thrash about and use his body momentum. (DS Depo. 43:24-44:11.) Once Decedent appeared calm and his ankles were secured in the WRAP device, the officers stood up to assess the situation and were no longer in contact with Decedent's body. (JB BWC 6:20-6:22). Officers monitored Decedent's breathing by watching him and listening to his breathing. (DW Depo. 130:7-21; DS Depo. 53:19-54:4.) Spencer spoke to Decedent and Decedent made verbal noises. When Decedent stopped making verbal noises Spencer noticed that he sounded like he was having difficulty breathing and he immediately ordered the officers to roll him over and remove the handcuffs. The officers then rolled Decedent on his side to check if he was still breathing and confirmed he was not breathing. (JB Depo. 117:24-118:5, 118:25-119:3; CB 159:14-25, 160:6-12; DW Depo. 128:21-130:6; DS Depo. 46:1-16, 49:10-13, 49:24-50:3, 102:19-103:4.)

Officers rubbed Decedent's sternum to elicit a response but he still did not respond. The officers moved Decedent out of the enclosure because it was too narrow to do CPR and they un-handcuffed him to start CPR. (JB Depo. 123:7-14; CB Depo. 161:8-12.) Willis and JB had earlier requested assistance from the fire department and the fire department arrived as officers started CPR. (JB Depo. 124:9-18.) JB started CPR chest compressions and continued until the fire department directed her to stop and paramedics took over. (JB Depo. 118:25-119:10, 123:15-25; CB Depo. 181:15-22.) Sturgeon, who has been arrested before and had numerous police contacts, did not see anything unusual or inappropriate in the officers' contacts with Decedent, and he believed the officers were trying to help Decedent. (Sturgeon Depo. 81:11-83:24, 85:13-86:6.) Decedent experienced cardiopulmonary arrest while under the influence of methamphetamine and died on January 3, 2018 at the hospital. (Josselson Depo. 30:8-16, 42:6-12.)

### C. City Training and Policies

Vacaville Police Department Policy 466, 466.4 and 466.6 are part of the City's de-escalation policy. (Larsen Depo. 21:16-22:9, 29:10-30:18, 34:10-17.) Policies 466 and 466.6 relate to crisis intervention ("CIT"), response to individuals experiencing mental health problems, de-escalation and reasonableness of actions in a situation. (Larsen Depo. 37:9-39:2, 25:8-21; Ex. 3 Policies 466, 466.6.) Policy 466.5 clarifies that officers should use reasonable tactics in response to the serious threat posed by mental health crises and are not limited by the de-escalation policy. (Larsen Depo. 59:1-60:6 and Policy 466.5 attached as Ex. 3.) Policy 308 and 325 outline the use of control devices, restraints, and techniques, including handcuffs. (Larsen Depo. 49:16-20, 43:6-11, 44:1-24; Ex. 3, Polices 308, 325.) Policy 325 and 325.2.4 set forth the WRAP Restraint devices policy. Policy 325.2.4 states the WRAP Restraint device is appropriate when an officer deems it "reasonable to restrain a violent or potentially violent person during the course of an arrest and or transportation" and includes monitoring guidelines ensuring the restrained individual does not roll onto their stomach, maintaining a free flow of air. (Larsen Depo. 39:23-40:23, 43:12-20; 50:9-51:9, 51:21-53:10; Exh. 3, Policy 325.2.4 .) Policy 418 and 466 refer to individuals suffering from mental health problems, possible considerations for officers evaluating potential mental health issues, and the possibility of de-escalation techniques. (Larsen Depo. 45:17-25, 53:11-55:18, 56:8-58:25; Exh. 3, Policies 418, 418.4.) All officers were provided copies of the Policies and updates, they were required to sign an acknowledgment of receipt, and they were expected to read

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

and abide by the entire Policy Manual and updates. (Larsen Depo. 24:17-24, 30:19-32:14, 33:3-34:9, 34:18-35:12.) For many years de-escalation has been consistently included in various areas of training and is essentially an unwritten policy of implementing de-escalation techniques when feasible and appropriate. (Larsen Depo. 29:16-30:4, 37:18-38:7)

Vacaville provides 12-18 hours per year of defensive tactics, including control and arrest techniques. Between at least 2012 and 2017, the City's police practices training included handcuffing, ground control techniques, placing subjects in a prone position, positional asphyxia, monitoring a subjects breathing and health, signs of labored breathing, officers' use of body weight on subjects, use of the WRAP device, placing subjects in a recovery position, responding to individuals with mental health issues or suffering from mental health crises. (Larsen Depo. 29:16-30:4, 37:18-38:7; Love Depo. 20:18-21:20, 22:18-23:1, 23:17-35, 25:19-24, 26:7-27:5, 27:21-28:21; 30:24-34:7, 35:23-36:12, 38:22.) 39:24-42:9, 43:9-45:13, 46:2-47:2, 48:12-24, 49:15-50:2, 53:7-54:4, 54:17-55:13, 56:5-20, 57:25-59:3; 60:5-61:5, 62:18-22, 63:18-24, 64:4-66:25 72:4-74:9, 74:16-75:25, 76:4-19, 79:1-17, 80:4-81:13, 82:3-8, 84:19-87:13, 88:5-91:1, 95:16-98:25, 101:7-10, 101:25-102:21, 107:4-25, 108:15-109:18, 110:9-15, 111:2-113:1, 115:6-18, 116:13-118:19, 120:11-24.) Officers were required to undergo crisis intervention techniques "CIT" training. (Love Depo. 94:15-95:15, 102:22-103:9, 104:2-22, 106:5-107:3, 108:3-14.) The officers completed the relevant training before the incident. (JB Depo. 43:2-47:24, 56:5-60:21, 63:9-23, 64:15-68:10, 134:8-135:14; CB Depo, 24:15-18, 39:8-18, 51:20-54:21, 57:15-61:11, 62:1-62:14, 64:3-65:23, 66:3-20, 76:12-19, 92:10-94:14, 96:5-97:7, 100:6-25, 102:8-23, 165:18-25, 166:14-19, 192:10-193:19; DW Depo. 37:17-23, 69:11-70:22, 73:9-75:13, 75:4-84:3; DS Depo. 47:9-18, 48:10-16, 50:20-51:8, 57:2-21, 58:12-17, 73:22-74:22, 87:19-21, 90:14-91:4.)

## III. LEGAL ARGUMENT

### A. Summary Judgment is Proper in This Case

On summary judgment, defendants bear the initial burden of demonstrating the absence of a genuine issue of material fact. (*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) .) The party asserting the existence of an issue of material fact must show "sufficient evidence supporting the claimed factual dispute…" (*T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987), *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 288-

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

289 (1968).) If the burden of persuasion at trial would be on the nonmoving party, the movant may carry its initial burden of production under Rule 56(c) by producing, "evidence negating an essential element of the non-moving party's case," or by showing … that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." (*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105-1106 (9th Cir. 2000).) The undisputed evidence in this case establishes summary judgment should be granted for Defendants.

**B.      Plaintiffs' §1983 Claim for Violation of Decedent's Fourth Amendment Rights is Meritless**

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." (*Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014), *citing Graham v. Connor,* 490 U.S. 386 (1989) .) "[D]etermining the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'…The inquiry requires analyzing the totality of the circumstances." (*Plumhoff*, 572 U.S. at 774.) The totality of circumstances to be considered in determining whether an officer's use of force was reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (*Graham*, 490 U.S. at 394.) "Ultimately, the 'most important' Graham factor is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" (*Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).) "Objective reasonableness [is] based upon the information the officers had when the conduct occurred." (*Cnty. of Los Angeles v. Mendez,* 137 S.Ct. 1539, 1546-1547 (2017), *Saucier v. Katz,* 533 U.S. 194, 207 (2001).) "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. … The calculus of reasonableness must [allow] for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." (*Graham*, 490 U.S. at 396-397; *Monzon v. City of Murrieta,* 978 F.3d 1150, 1158 (9th Cir. 2020).)

Plaintiffs allege that the officers used excessive force in restraining Decedent and prevented him from breathing. The undisputed evidence in this case, however, establishes that officers' use of force was objectively reasonable under the totality of the circumstances and Plaintiffs' excessive force claim is

meritless. The officers were responding to reports of a fight and/or a suicidal individual when they encountered Decedent, who was agitated and appeared to be in some sort of distress. When JB first arrived she saw Decedent lying on the ground in a small narrow area, shirtless and with his pants pulled down. Sturgeon and Hays who were with Decedent were agitated and attempting to calm Decedent, and they requested help from JB and said they were trying to stop Decedent from killing himself. Decedent was a large man and when he got up into a kneeling position he was face-to-face with JB, and she ordered him to get down on the ground but he failed to comply. Sturgeon and Hays struggled with Decedent and forced him down to the ground into a prone position as Decedent physically resisted their efforts. Decedent was so combative with his brother (Sturgeon) and friend (Hays) that they asked JB for her handcuffs and repeatedly requested that she handcuff Decedent, but JB had not yet investigated the situation and did not yet know whether handcuffs were warranted. When the other officers arrived on scene they saw Sturgeon and Hays still struggling with Decedent and trying to hold him down, yelling at him to calm down, to stop fighting and stop resisting, and they were attempting to force his hands behind his back as he struggled against them. Based on the information they were given and their observations of Decedent's agitated state and behavior, the officers believed Decedent needed to be restrained to prevent him from hurting himself, the officers or others, particularly given that he reportedly was suicidal. Decedent refused to comply with orders and physically resisted the officers' efforts to handcuff him, and the officers used only their body weight to try to prevent his movement, control his arms and counteract his resistance. Decedent was a large man and JB used her body weight to try to hold Decedent in place as he thrashed around and struggled to pull his hands away from being handcuffed and refused to take his left hand out from under his body; CB placed his knee on Decedent's shoulder area and used his weight to press his knee against Decedent only when Decedent pushed up against him as if he was trying to escape their control; Spencer applied knee strikes to Decedent's side or back in response to his continued refusal to comply with orders to move his hand out from under his torso and his physical struggle with the other officers against being handcuffed; and Willis only placed the top of his foot on Decedent's arm, without applying pressure, to remain ready to use his body weight if the situation escalated and Decedent continued physically resisted being restrained. The officers used no weapons to subdue Decedent. The undisputed evidence shows that the force used was in response to and commensurate with Decedent's level of resistance, and the officers removed themselves and their body weight once Decedent was secured in handcuffs and no longer physically struggling. The officers' use of force thus was

objectively reasonable under the totality of circumstances known to them at the time and did not violate the Fourth Amendment.

Keeping Decedent in a prone position for no more than 44 seconds after he stopped struggling enough for officers to move away from him while they were in the process of securing him in the WRAP device also was objectively reasonable. The officers spent over two and half minutes wrestling with Decedent to move his hands behind his back to handcuff him, and because of his stature and his behavior they were concerned about what he might do if he stood up unrestricted. They were in a small space and even after struggling against the officers Decedent continued to tense his muscles, move about and make grunting and growling noises. The officers stood up and were not putting pressure on Decedent's body and they remained in close proximity to Decedent, monitoring his breathing by watching him and listening to his breathing. The officers also did not leave Decedent in a prone position for a protracted period of time. Only 44 seconds elapsed from the time Decedent calmed down and was under control enough (i.e. handcuffed and ankles secured in the WRAP device) for the officers to move away from him until he exhibited difficulty breathing. The officers rolled Decedent on his side as soon as they determined he was not breathing. Keeping Decedent in a prone position was objectively reasonable under the totality of circumstances and did not violate the Fourth Amendment.

The undisputed evidence establishes that the officers were attempting to assist Decedent and detain him for his safety and the safety of others, and the officers' use of their body weight to control Decedent's physical resistance and allowing him to briefly remain in a prone position after he was handcuffed and seemingly calm was objectively reasonable under the totality of circumstances. Summary judgment on Plaintiffs' excessive force claim should be granted in Defendants' favor.

## C. Plaintiffs' Claim For Violation Of Their Fourteenth Amendment Rights Is Meritless

Plaintiffs' 14th Amendment claim for interference with their rights to familial association fails to the same extent Decedent's claim fails. Where a claim for interference with familial relationships is integrally predicated upon, or entwined with, other allegedly unconstitutional conduct, a finding that the other conduct was not unconstitutional generally will preclude recovery for interference with familial relationship. (*Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004); *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001).) Plaintiffs' claims are integrally predicated upon and entwined with Decedent's claims because no conduct was directed at them, and their claims arise out the alleged

violation of his rights. Their 14th Amendment claims thus fail to the same extent Decedent's claim fails.

Further, even if Decedent's excessive force claim was viable, Plaintiffs' 14th Amendment claims on their own behalf still are unsupportable, as their 14th Amendment claims require a much higher standard of proof than the "reasonableness" standard for Fourth Amendment claims. "[T]he Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." (*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).) **"[C]onduct intended to injure in some way unjustifiable by any government interest** is the sort of official action most likely to rise to the conscience-shocking level." (*Id.* at 849, emphasis added.) When unforeseen circumstances demand an officer's instant judgment, "**only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience necessary for a due process violation**." (*Id.* at 836, emphasis added.) The Ninth Circuit likewise clarified that the purpose to harm standard governs familial association claims based on a police officer's use of force in the course of an investigation. (*Porter v. Osborn*, 546 F.3d 1131, 1137, 1140 (9th Cir. 2008).) The type of law enforcement action sufficient to rise to this high level of culpability is akin to the use of force that "is meant only to 'teach him a lesson' or to 'get even'… *Lewis* contemplates such 'rare situations where the nature of an officer's deliberate physical contact is such that a reasonable factfinder would conclude the officer intended to harm, terrorize or kill." (*Porter,* 546 F.3d at 1140-1141.)

The entire incident in this case occurred within minutes, and involved the following: Decedent repeatedly refusing to obey commands to show his hands; Decedent physically resisting the officers' efforts to restrain and handcuff him; and the officers allowing Decedent to remain in a prone position for 44 seconds after he was handcuffed and calmed enough that officers could move away before he exhibited difficulty breathing. The situation was rapidly evolving and the purpose to harm standard applies to analyze Plaintiffs' 14th Amendment claims. The undisputed evidence establishes that the officers were attempting to help Decedent and prevent him from hurting himself or others, they repeatedly sought his compliance to stop struggling and move his hand out from under his torso. Plaintiffs have no evidence to show that any of the officers took any action for any purpose unrelated to the legitimate object of restraining Decedent to get him help.  There is no evidence of any intent to inflict

force beyond what was necessary and their conduct was not conscience shocking. Plaintiffs' 14th Amendment claims for interference with familial association are unsupportable.

**D.     The Officers Are Entitled to Qualified Immunity**

Even if Plaintiffs somehow could show that the officers' use of force violated Decedent's or their civil rights, which the evidence fails to support, JB, CB, Willis and Spencer are entitled to qualified immunity. Qualified immunity protects officers from liability where their conduct does not violate clearly established law, **notwithstanding that reasonable officers could disagree.** (*Pearson v. Callahan,* 555 U.S. 223, 231 (2009).) A court discerns whether "the [officer] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable interpretation of the events can be constructed…after the fact." (*Hunter v. Bryant,* 502 U.S. 224, 228 (1991).) Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." (*Id.* at 227; *Brosseau v. Haugen,* 543 U.S. 194, 205 (2004).) To defeat qualified immunity, the law must be "'clearly established in light of the specific context of the case' at the time of the events in question." (*Mattos,* 661 F.3d at 440.) **It is Plaintiff's burden to show the law was clearly established so "every reasonable official would [have understood] that what he is doing violates that right.**" (*Reichle v. Howards*, 566 U.S. 658, 664 (2012), emphasis added.) "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." (*Id.* at 664; *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).) Whether the law was clearly established "must be [determined] in light of the specific context of the case, not as a broad general proposition." (*Katz,* 533 U.S. at 205, overruled in part regarding mandatory analysis procedure; *Pearson,* 555 U.S. at 232.) "[It must] be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (*Katz, supra* at 202, emphasis added; *Brosseau, supra* at 205; *Mattos,* 661 F.3d at 442.) It is not enough to "determine the broad question of whether the seizure…violated the fourth amendment's proscription against unreasonable seizures." (*Maag v. Wessler,* 960 F.2d 773, 775 (9th Cir. 1991).) "[G]eneral Fourth Amendment principles may only provide clearly established law in *obvious cases* and the Supreme Court clarified that the bar for finding such obviousness is quite high.…[and] it has 'repeatedly told courts not to define clearly established law at a high level of generality.'" (*Mattos*, 661 F.3d at 442; *City and Cnty of San Francisco v. Sheehan,* 135 S.Ct. 1765, 1775-1776, (2015); *Reese v. Cnty. of Sacramento,* 888 F.3d 1030, 1036-1040 (9th Cir. 2018).)

"[T]he clearly established law must be "particularized" to the facts of the case. … Otherwise

"[p]laintiffs would be able to convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." … [¶] [It requires] a case where an officer acting under similar circumstances … was held to have violated the Fourth Amendment. … [such that] **"in the light of pre-existing law the unlawfulness must be apparent."**… [Emphasis added.]

(*White v. Pauly,* 137 S.Ct. 548, 552 (2017); *Brosseau*, 543 U.S. at 199.) Where a case presents a "unique set of facts and circumstances," this alone should be an indication that an officer's conduct did not violate a "clearly established" right. (*White,* 137 S.Ct. at 552.) The Supreme Court repeatedly has reversed Ninth Circuit decisions denying qualified immunity, and expressly admonished courts not to define clearly established law at a high level of generality. (*Kisela v. Hughes,* 138 S.Ct. 1148, 1152 (2018); *Reese*, 888 F3d at 1040.) For example, in *Kisela,* the Supreme Court reversed the Ninth Circuit and reiterated that:

> Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White,* 580 U.S., at —, 137 S.Ct., at 551 …
>
> "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna,* 577 U.S. —, —, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (*per curiam *1153*) … Use of excessive force is an area of the law **"in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.** *Id.,* at —, 136 S.Ct., at 309 …. [¶] **An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it**." [Citations omitted]

(*Kisela*, 138 S.Ct. at 1152–3, emphasis added; *see also City of Escondido v. Emmons,* 139 S.Ct. 500, 503 (2019).) The Ninth Circuit's reliance on case authorities involving dissimilar factual was improper to show clearly established law. The differences in those cases and the *Kisela* facts 'leap from the page,' and the attempt to rely on such cases to constitute clearly established law 'does not pass the straight-face test.'" (*Id.* at 1154.) The law was not clearly established prohibiting the use of force under the specific facts confronting Kisela, and he was entitled to qualified immunity. (*Id.* at 1155.)

Plaintiffs in this case likewise cannot meet their burden to establish that the law was clearly established prohibiting JB, CB, Willis or Spencer's conduct under the particular undisputed facts of this case. Plaintiffs cannot identify any authority that clearly prohibited JB from placing her knees on either side of

Decedent and using her body weight on his lower body to try to counter his attempts to get up, handcuffing him to restrain him to prevent him from hurting himself or others, attempting to help him in his distressed state, using commensurate force to counter his resistance, or moving his arms behind his back to handcuff him. Plaintiffs cannot identify any authority that clearly prohibited CB from placing a knee on Decedent's shoulder while placing his other knee on the pavement and using his grounded knee to bear his weight, using his body weight to press his knee on Decedent's shoulder when he moved his body up off the ground, using his body weight to hold Decedent down as officers struggled with him and he physically fought their efforts to handcuff him, grabbing Decedent's arm and trying to pull it out from under him or assisting in moving his hand back behind his back for handcuffing. Plaintiffs cannot identify any authority that clearly prohibited Willis from placing his foot on Decedent's arm while keeping his weight on his other foot and the wall or remaining ready to use pressure from his foot to hold Decedent down in case he resumed struggling. Plaintiffs likewise cannot identify any authority that clearly prohibited Spencer from using his knee to strike Decedent in the side or back when he continued to physically struggle and fight against the officers' efforts to handcuff him. They also cannot identify any authority that clearly prohibited the officers from allowing Decedent to briefly remain in a prone position after he was handcuffed to prevent him from resuming his efforts to physically resist being detained or to prevent injury to anyone. Plaintiffs cannot meet their burden to show clearly established law prohibiting any of the officers' conduct under the totality of circumstances and case authorities existing in 2017, such that every reasonable officer in 2017 facing substantially the same circumstances as the defendant officers would have known that their individual actions were unlawful. JB, CB, Spencer and Willis, therefore, are entitled to qualified immunity from all of Plaintiffs' claims.

## E.    The Third Cause of Action for §1983 *Monell* Liability is Meritless

A public entity cannot be held vicariously liable under §1983 and may be liable only when a violation of a federally protected right can be attributed to (1) an express municipal policy, such as an ordinance, regulation or policy statement (*Monell*, 436 U.S. 658); (2) a "widespread practice that … is 'so permanent and well settled as to constitute a custom or usage' with the force of law" (*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); (3) the decision of a person with "final policymaking authority" (*Id.* at 123); or (4) inadequate training that is deliberately indifferent to an individual's constitutional rights (*City of Canton v. Harris,* 489 U.S. 378 (1989)). A municipality only may be liable "where its policies are the moving force behind the constitutional violation." (*Id.* at 389; *Connick v. Thompson,* 563 U.S. 51, 60 (2011).) "[R]igorous

standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." (*Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1996).) Further, municipal liability is contingent on an underlying violation of constitutional rights. (*City of L.A. v. Heller*, 475 U.S. 796, 799 (1986); *Aguilera v. Baca*, 510 F.3d 1161, 1174 (9th Cir. 2007).) Plaintiffs' §1983 claim against the City is based on theories of a policy, custom or practice and inadequate training. (SAC, Dkt. No. 28, ¶¶46-49.) As set forth above, the undisputed evidence establishes that no constitutional violation occurred, and Plaintiffs have no evidence to establish their *Monell* claim against the City.

### 1. No Evidence Supports A Claim Based On A Pattern, Policy Or Custom

To show municipal liability based on a pattern, custom or practice, the critical issue is whether there was a particular custom or practice that was so widespread as to have the force of law. (*Brown,* 520 U.S. at 404.) "The custom or policy must be a 'deliberate choice to follow a course of action…made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" (*Castro v. Cnty. of L.A.,* 833 F.3d 1060 (9th Cir. 2016); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986).) Plaintiff cannot merely "identify a custom or policy, attributable to the municipality, that caused his injury. [He] must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [parties]." (*Castro,* 833 F.3d at 1076; *Harris,* 489 U.S at 392.) Plaintiffs have no evidence to show that their constitutional rights were violated by an official municipal policy or widespread practice. The City's policies set forth requirements and guidelines for the use of force, use of body weight to control non-compliant subjects, crisis intervention, placing subjects in a prone position, monitoring subjects, responding to mental health crises situations, use of handcuffs and de-escalation. Plaintiffs have no evidence of any other similar incidents, or any other evidence to show the City's policies were inadequate. Notably, there is no evidence to show a causal connection between a City custom or policy and the alleged violation of Decedent's or their rights and they cannot show that any City policy was the moving force behind the officers' actions. (*Harris,* 489 U.S at 392.) Plaintiffs cannot meet the "rigorous standard" of culpability and causation and their *Monell* claim is unsupportable. (*Brown,* 520 U.S. at 405.)

### 2. Plaintiffs' Inadequate Training Claim Is Unsupportable

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." (*Connick,* 563 U.S. at 61.) Liability based on a failure to train attaches "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into

contact." (*Harris,* 489 U.S. at 388.) Deliberate indifference is shown when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymaker of the city can reasonably be said to have been deliberately indifferent to the need." (*Id.* at 390.) While this is a high standard, "permitting cases against cities for their 'failure to train' employees to go forward…on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities–a result [the Court] rejected in *Monell.*" (*Harris,* 489 U.S. at 391-392.) Inadequate training claims "will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible." (*Id.* at 389.)

> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program… Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training… Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program…And plainly, adequately trained officers occasionally make mistakes: the fact that they do says little about the training program or the legal basis for holding the city liable.… Moreover, … [plaintiff] must still prove that the deficiency in training actually caused the…[violation]. [¶] To adopt lesser standards…would result in *de facto respondeat superior* liability on municipalities – a result we rejected in *Monell.* (*Id.* at 389-392.)

The undisputed evidence shows the City provided substantial training on the tactics implemented by the officers in their contact with Decedent, and the officers testified that, before the incident, they received basic and additional training on the tactics implemented. Plaintiffs have no evidence to show the City's training programs were inadequate in any respect, or that the need for more or different training was so obvious and so likely to result in constitutional violations that the City could be liable for failing to provide such training. Plaintiffs cannot meet the high deliberate indifference standard required to establish municipal liability based on inadequate training.

## IV.    CONCLUSION

Defendants respectfully submit that the instant motion for summary judgment, or alternatively, partial summary judgment, should be granted in favor of Defendants and against Plaintiffs.


Dated:  September 30, 2022                          BERTRAND, FOX, ELLIOT, OSMAN & WENZEL


By:  /s/ *Richard W. Osman*
Richard W. Osman
Sheila Crawford
Attorneys for Defendants

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT