FULVIO CAJINA (SBN 289126)
LAW OFFICES OF FULVIO F. CAJINA
528 Grand Avenue, Oakland, CA 94610
Tel: 415-601-0779 Fax: 510-225-2636
Email: fulvio@cajinalaw.com

STANLEY GOFF (Bar No. 289564)
LAW OFFICE OF STANLEY GOFF
15 Boardman Place Suite 2
San Francisco, CA 94103
Telephone: (415) 571-9570
Email: scraiggoff@aol.com

Attorneys for Plaintiffs CARMEL GARCIA, et al.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARMEL GARCIA, an individual; M.Y. AND L.Y., minors by and through their guardian ad litem VANESSA RUIZ; L.Y., a minor by and through his guardian ad litem FRANCISCA URIOSTEGUI,<br><br>Plaintiff,<br><br>v.<br><br>YUBA COUNTY SHERIFF'S DEPARTMENT; YUBA COUNTY SHERIFF'S DEPUTIES DOES 1-5; CITY OF VACAVILLE; and VACAVILLE POLICE OFFICER DOES 6-10;<br><br>Defendants. | Case No. 2:19-cv-02621-KJM-DB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Date: November 4, 2022**<br>**Time: 10:00 a.m.**<br>**Place: Zoom Webinar**<br>**Judge: Kimberly J. Mueller** |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

For nearly twenty (20) years the Ninth Circuit has warned that prone and handcuffed individuals in an agitated state may suffocate under the weight of restraining officers. This known risk goes by the name of restraint asphyxia or positional asphyxia and has reached national prominence in the wake of George Floyd's death in 2020.

On December 29, 2017, Samuel Levi Yasko was undergoing a mental health crisis. According to his brother, Joseph Sturgeon, Samuel had tried to commit suicide while Joseph and his friend, Jason Hays, were driving Samuel home from work. In the car, Samuel had wrapped a seatbelt around his neck, prompting Joseph and Hays to exit the highway and drive to a gas station in Vacaville, California. Eventually, Joseph and his friend called dispatch to report that Samuel was trying to commit suicide and to request assistance. Vacaville officers responded to the call.

The responding officers, Julie Bailey, her husband, Chuck Bailey, and sergeant David Spencer all agree that Samuel was not assaultive (i.e., he never threw punches or kicks at the officers), but agitated. Within minutes of arriving on scene, officers had Samuel in handcuffs and prone on the concrete floor of the gas station parking lot. Samuel was not being detained for committing a crime, but presumably so that he could not hurt himself.

Body camera footage shows that for the next several minutes, instead of placing Samuel in a recovery position – on his side to facilitate his breathing, officers continue to apply body weight to Samuel's torso, including near his neck area, while he remains handcuffed and prone. Samuel's breathing becomes shallower and shallower on the video. Consistent with the Ninth Circuit's warning, Samuel stops breathing in that position and loses consciousness. The officers then try CPR, but it is too late. Samuel is brain dead.

According to Vacaville's designated person most knowledgeable regarding its policies and procedures, in 2017 Vacaville had no policy or procedure that alerted its officers of the risks of putting weight on the back of a prone and handcuffed suspect, or any policy or procedure that even mentioned "positional asphyxia." Not surprisingly, the defendant officers have testified that Vacaville did not train them on the risks of placing body weight on the back of a prone and handcuffed individual. In

fact, despite Samuel's death, Sergeant David Spencer, the commanding officer at the scene still does not believe that placing weight on a suspect's back is even a risk, explaining at his deposition:

> *Q.     Let me ask you this: Do you agree that a law enforcement officer's use of body weight to restrain a prone and handcuffed individual can cause suffocation under the weight of the restraining officers?*
> *A.     You're saying the body weight of an officer on the back of a suspect can cause suffocation?*
> *Q.     Yes, handcuffed -- in a prone and handcuffed individual. Yes.*
> *A.     I personally have never seen that. I understand that there are studies that may say that, but I've never seen it in 35-plus years of doing this.*
> *Q.     Okay.  <u>And has the City of Vacaville trained you or taught you that an officer's body weight restraining a prone or handcuffed individual can cause the individual to suffocate?</u>*
> *A.     <u>They have not trained me, no.</u>*
> *Q.     Okay.  What about, have you -- do you agree that an officer's use of body weight to restrain a prone and handcuffed individual in an agitated state can cause that individual to suffocate?*
> *A.     No.* (DMF 23, Spencer Depo., 77:22-78:18) (emphasis added).

Defendants' motion for summary judgment must be denied for two main reasons. Firstly, the motion is improper as it has been filed without an accompanying statement of undisputed facts that "enumerate[s] discretely each of the specific material facts" relied on by Defendants. See L.R. 260(a). Secondly (and most importantly), there are genuine disputes of material facts that would allow a jury to find a violation of decedent's fourth amendment rights, plaintiffs' fourteenth amendment rights, and for *Monell* liability. Here, we have body camera footage that shows defendants continuing to apply body weight to a prone, handcuffed, and non-violent person undergoing a mental health crisis, ultimately causing his death. And from the officers' own admissions, we know that none of them were ever trained of the risks of such behavior by their police department – a department that also did not have a policy of sending trained crisis intervention officers to deal with persons undergoing mental health crises. Accordingly, Defendants' motion fails.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT     2

## II. **STATEMENT OF DISPUTED FACTS**

Vacaville Police Department dispatch received a call regarding a possible suicide attempt by decedent, Samuel Levi Yasko, on December 29, 2017, at approximately 8:00 PM. Defendant Officer Julie Bailey was the first Vacaville Police Department officer to respond to that call on December 29, 2017. Soon after arriving on scene, defendant Julie Bailey understood – from both what witnesses and dispatch were telling her – that decedent was a suicide risk. (DMF 1, 2 and 3).

Officer J. Bailey was not a crisis intervention officer. Unfortunately, even though back in 2017, Vacaville Police Department patrol officers regularly interacted with individuals undergoing mental health crises, such as decedent, at that time, the Vacaville Police Department did not have a policy of sending trained crisis intervention officers to calls related to persons undergoing mental health crises. In fact, the Vacaville Police Department did not provide its officers with resources to deal with persons undergoing mental health crises – the officers, for example, couldn't call a mobile crisis response team for assistance when dealing with suicidal persons. And none of the officers who responded to the December 29, 2017 call involving decedent were crisis intervention officers. (DMF 4, 5, 6 and 7).

When Officer J. Bailey arrived on scene, she was unaware if decedent had committed a crime. Nonetheless, she decided to handcuff decedent. According to Officers J. Bailey, her husband, Officer Chuck Bailey, and Sergeant David Spencer, decedent never acted in an assaultive manner toward them. He never swore at them, threatened them, or threw punches or kicks. (DMF 8 and 9). Decedent was initially placed in a prone position by his brother, Joseph Sturgeon, and his friend, Jason Hays. The responding Vacaville Police Department officers eventually moved Sturgeon and Hays out of the way and positioned themselves to hold decedent down in a prone position to handcuff him. (DMF 10 and 11). The officers and decedent struggled when the officers tried to place him in handcuffs. The officers believe that decedent was resisting by, among other things, trying to lift his torso prior to being cuffed. Another likely interpretation of the video footage is that decedent was trying to prop himself up with his hands to breathe as the officer piled on top of him. (DMF 31 and 32).

The officers were able to handcuff decedent. Even after handcuffing him, however, officers continued to apply pressure to decedent's torso while he continued to lay in a prone position on the ground. Moreover, none of the individual defendants took any steps to place decedent in a recovery

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT  3

position – on his side – after being handcuffed until decedent lost consciousness. Officers are trained that the recovery position facilitates breathing. For that reason, defendants are trained to place a suspect in a recovery position as soon as possible when the suspect is prone and has been subjected to a long struggle. Yet, they didn't do that in this case. (DMF 12, 13, 14 and 15).

Instead, the officers continued to apply pressure to decedent's back. Defendant Julie Bailey sat on or about decedent's buttocks area before and after handcuffing him. Defendant Chuck Bailey pressed his knee near decedent's neck area and/or on his left shoulder blade both before and after decedent was handcuffed. Defendant Dustin Willis used his foot to pin decedent to the ground both before and after he was handcuffed. And Defendant David Spencer deployed several knee-strikes to decedent's right abdomen area while he was prone. After several minutes of having his torso pinned to the ground while handcuffed, decedent's breathing became shallower and shallower until he eventually stopped breathing. (DMF 16, 17, 18, 19 and 20)[1]. Officers didn't place decedent into a recovery position – on his side – until after they noticed decedent stopped breathing. (DMF 21).

At the time of the incident, none of the Vacaville Police Department's policies and procedures alerted officers of the risks of placing pressure to the back of a prone and handcuffed suspect. In fact, there was no mention of positional asphyxia at all in any of the Vacaville Police Department's policies and procedures. (DMF 22). According to defendants J. Bailey, C. Bailey, and Sgt. Spencer, prior to this incident, they never received any training from the Vacaville Police Department regarding the risk of death associated with placing weight on the torso of a handcuffed suspect in a prone position. In fact, Sgt. Spencer still doesn't believe that officer's applying weight to the back of a prone and handcuffed suspect can cause a suspect's death. (DMF 23).

Solano County's medical examiner, Dr. Arnold Josselson disagrees. Dr. Josselson ruled decedent's cause of death as: "Cardiopulmonary Arrest shortly after Physical Confrontation with Law Enforcement Officers while under the Influence of Methamphetamine (days)." (DMF 24). However, at his deposition, Dr. Josselson defined "restraint asphyxia" as a death typically involving a suspect with drugs on board, who is involved in a struggle, placed in a prone position, and

---

[1] Defendants contend that officers only left decedent in a prone position for 44 seconds after he "calmed down." (Dkt. 68, 14:10-13). Plaintiffs disagree with the their portrayal of events. (See DMF 20).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT 4

subjected to pressure on his back by officers. (DMF 25). Dr. Josselson also explained that restraint asphyxia is a type of positional asphyxia. (DMF 30).

Dr. Josselson further testified that if he was aware that a suspect/decedent was prone, handcuffed, had methamphetamine in his system, and officers had applied weight on his back when the suspect lost consciousness, then he might call that a "restraint asphyxia" death, which he would further manner as a homicide. (DMF 26 and 27).

Unfortunately for plaintiff, Dr. Josselson testified that in this case involving Vacaville police and decedent, <u>Vacaville never provided him with body camera footage of the incident despite his requests for such footage</u> and even though such footage would have been helpful for his investigation of decedent's cause of death. (DMF 28 and 29). However, based on the footage, had Vacaville not intentionally withheld the body camera footage from the medical examiner, it is likely that Dr. Josselson would've found decedent's death to have been caused by restraint asphyxia – a homicide[2]. (DMF 25, 26, 27, 28 and 29).

### III. ANALYSIS

#### A. Standard for Summary Judgment

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That is, the moving party must show that there are no material facts – facts that are substantively important under the relevant law – in genuine dispute. A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have

---
[2] Plaintiffs further note that expert discovery has not yet commenced in this case. Plaintiffs have retained medical experts and their opinions are forthcoming.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT 5

enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Nissan Fire, 210 F.3d at 1103.* However, the Court is required to view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *City of Pomona v. SQM N. Am. Corp.,* 750 F.3d 1036, 1049 (9th Cir. 2014).

### B. **Defendants' Motion for Summary Judgment is Procedurally Defective for Failure to Comply with Local Rule 260(a)**

The Eastern District's Local Rule 260(a) requires that a moving party moving for summary judgment *accompany* its motion with a "'Statement of Undisputed Facts' that shall enumerate discretely each of the specific material facts relied upon in support of the motion and cite the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon to establish that fact." L.R. 260(a). That is, moving parties are supposed to file a separate statement of undisputed facts along with – i.e., "accompan[ying]" – their motions. *Id*.

Defendants did not do so in this case, failing to comply with Local Rule 260(a) given that no Statement of Undisputed Facts, enumerating each specific material fact, accompanies their motion. This procedural defect alone is fatal to Defendants' motion. See, e.g., *Bohannon-Hingston v. Brachfeld Law Grp.*, No. CIV S-11-776 KJM-EFB, 2011 U.S. Dist. LEXIS 120456, at *1-2 (E.D. Cal. Oct. 17, 2011) (denying a moving party's motion for summary judgment for failure to comply with Local Rule 260(a)). However, even on the merits, Defendants' motion fails.

### C. **The Defendant Officers Employed Excessive Force on the Handcuffed, Prone, and Non-threatening Decedent**

Under the Fourth Amendment, the amount of force used by law enforcement officers effectuating an arrest must be objectively reasonable when viewed in light of the totality of the

circumstances. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Determining the objective reasonableness of a particular use of force involves a three-step inquiry looking to "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape." *Maxwell v. Cty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012). These factors are non-exhaustive. *Id.*

The final step is to balance the degree of force used against the government interest at stake to determine if the force used was "greater than is reasonable under the circumstance." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). This determination is "ordinarily a question of fact for the jury." *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997). Accordingly, "summary judgment should be granted sparingly." *Maxwell*, 697 F.3d at 951.

Here, it is undisputed that Vacaville police were summoned because the decedent was suicidal. (DMF 1). Vacaville 9-1-1 dispatch received a call at approximately 8:00 p.m. alerting them that decedent was a suicide risk and asking the police for help. Officer J. Bailey admits that when she arrived, she was unsure whether any crime had been committed. (DMF 8). Nonetheless, she proceeded to call cover officers and, together, she and Officers C. Bailey, Willis, and Sgt. Spencer proceeded to handcuff the decedent. (DMF 11). Based on the body camera footage, Officer J. Bailey sat on top of decedent's buttocks while she tried to handcuff him; her husband, Officer C. Bailey, knelt on decedent's upper back; and Officer Willis pinned decedent's torso with his foot. Sgt. Spencer also assisted in the handcuffing and employed several knee-strikes to decedent's abdomen. (DMF 11, 16, 17, 18, and 19). All the while, the body camera footage shows, and Officers J. Bailey, C. Bailey, and Sgt. Spencer agree, that decedent was not assaultive toward the officers. Decedent never kicked the officers, tried to punch them, swore at them – nothing. He was just face down. And though the officers had some difficulty handcuffing them, decedent did not try to flee or fight them. (DMF 9).

Further, once decedent was handcuffed, he did not pose a threat to the officers. Yet, he was not immediately placed in a recovery position. Instead, the officers continued to keep Samuel prone and on his stomach while continuing to apply pressure to his back for approximately three minutes *after* he

was handcuffed[3]. (DMF 12, 13, and 14). During that time, decedent's breathing becomes shallower and shallower and he goes silent. Officers eventually determine that he's stopped breathing. Then and only then, the officers finally place decedent in a recovery position. (DMF 20 and 21). But by then it's too late. Decedent has gone into cardiopulmonary distress and is brain dead. (DMF 24). Decedent's death is a textbook case of positional/restrain asphyxia – a condition the Ninth Circuit has warned of for nearly 20 years. (See DMF 25, 26 and 30; and also *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056-57 (9th Cir. 2003)).

Applying the *Graham* test, defendants' actions were in violation of the Fourth Amendment. The officers were unaware whether decedent had committed a crime; the decedent did not pose a threat to officers or bystanders when officers continued to apply pressure to his back while he was prone and handcuffed; and from the video it is clear that decedent was not trying to escape or flee when he was handcuffed. Instead, he was slowly dying under the weight of the officers. Viewing the evidence in the light most favorable to Plaintiffs, at the very least a reasonable jury could find that the officers' use of force was excessive. See *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d at 1056-57. In fact, as the *Drummond* Court explained nearly 20 years ago, the risks of positional/compression asphyxia were so well known that the Anaheim Police Department had released a bulletin on the subject in 1998, alerting its officers of the dangers of placing body weight on prone and handcuffed suspect. *Id*. at 1059. For that reason, the *Drummond* Court held that placing weight on the back of a prone and handcuffed individual represents "clearly constitutionally excessive [force] when compared to the minimal amount that was warranted." *Id.* Here, like in *Drummond*, once handcuffed, the officers just needed to place decedent in a recovery position while they decided what to do next. Instead, they kept Samuel on his stomach and continued to apply weight to his back, preventing him from breathing.

This case is also reminiscent of another Eastern District of California case where a detainee, who was clearly under the influence, was restrained and prone on the ground for minutes while four officers applied body-weight pressure to his back, resulting in his death. See *Garlick v. Cty. of Kern*,

---

[3] Decedent was prone and with weight on his back for over (5) minutes when adding the time that Samuel was prone before and after he was handcuffed. (See CITY001170 from 1:15-6:19; DMF 10, 11, 12).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT 8

167 F. Supp. 3d 1117, 1155 (2016). The court in that case noted that "[p]revailing precedent in the Ninth Circuit is that law enforcement officers' use of body weight to restrain a 'prone and handcuffed individual, [] in an agitated state,' can cause suffocation 'under the weight of restraining officers,' therefore, such conduct may be considered deadly force." *Id*. (citing *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d at 1056-57). "Known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id.* (citation omitted). In *Drummond*, like here, the decedent "offered no resistance," yet the officers continuously applied their weight to his neck and upper torso. *Id. Drummond*, like Samuel, soon fell into respiratory distress, and eventually lost consciousness. *Id.* at 1054-55. In analyzing the *Graham* factors, the court found that the officers applied severe force that resulted in compression asphyxia, *id.* at 1056, despite the minimal need for force because Drummond was not resisting and "*no* underlying crime was at issue." *Id.* at 1057 (emphasis in original) (internal quotation marks omitted)[4].

The *Garlick* court found that "*Drummond*[] makes plain that multiple officers' use of prolonged body-weight pressure to a suspect's back is known to be capable of causing serious injury or death." *Garlick*, 167 F. Supp. 3d at 1155 (citing *Drummond*, 343 F.3d at 1056). Viewing the facts in the light most favorable to the plaintiffs, a jury can also find that the defendants here violated decedent's Fourth Amendment rights by continuing to apply pressure to his back after being handcuffed. In fact, decedent's resistance to officers <u>prior</u> to being handcuffed can also support a finding of excessive force per *Graham* given that a jury may determine that decedent was not resisting the officers, but in fact struggling to breathe under the combined weight of officers, constituting a severe use of force. <u>See</u> *Greer v. City of Hayward*, 229 F. Supp. 3d at 1108; <u>and</u> <u>also</u> DMF 32.

### D. **Defendants' Were Deliberately Indifferent to Plaintiffs' Fourteenth Amendment Rights**

---

[4] The Officers use of body weight on decedent *in order to handcuff him* also creates a triable issue of fact under *Graham* regarding excessive force given that decedent's struggle with the officers were likely efforts by him to breathe. In *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017), citing *Garlick*, the Court explained that *"*the officers' weight on [decedent's] back restricted his breathing and that [his] movements trying to lift his chest and kicking his legs were not resistance but a sign of his struggle to breathe. In finding a genuine issue of material fact whether the detainee was actively or passively resisting, the court noted that '[s]imilar cases turn on the fact-finder's determination of where on the spectrum of resistance a misdemeanor suspect falls.'" *Id.* (internal citations and quotations omitted); <u>see</u> <u>also</u> DMF 31 and 32.

Parents and children have a "fundamental liberty interest" in "the companionship and society of their child or parent" as a component of their substantive due process rights under the Fourteenth Amendment – a right to familial relations. *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013). The Fourteenth Amendment's substantive due process clause protects against "government power arbitrarily and oppressively exercised." *Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998). "The Supreme Court has made it clear ... that only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Lewis*, 523 U.S. at 846). "The relevant question ... is whether the shocks the conscience standard is met by showing ...deliberate indifference or requires a more demanding showing [of] a purpose to harm [decedent] for reasons unrelated to legitimate law enforcement objectives." *Greer v. City of Hayward*, 229 F. Supp. 3d at 1108 (quoting *Porter*, 546 F.3d at 1137). Evidence of ulterior motive or bad intent is not required to satisfy the purpose to harm standard. *S.R. Nehard v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019). "The lower 'deliberate indifference' standard applies to circumstances where 'actual deliberation is practical.'" *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

Plaintiffs urge the Court to apply the deliberate indifference standard here given the ample time that defendants had to place decedent in a recovery position after handcuffing him. The Vacaville officers should have turned decedent on his side to facilitate his breathing three (3) minutes before he was found unresponsive. That's precisely how the officers were trained. (DMF 14). Instead, the officers can be seen talking and otherwise just nonchalantly trying to figure out what next to do with the decedent while continuing to keep him in a prone position with weight being applied to his back. (DMF 12). During that time, decedent was slowly dying at the officers' feet and knees. (DMF 24-27).

Viewing the evidence in the light most favorable to plaintiffs, the officers had actual time to deliberate and decide to place decedent in a recovery position. They just chose not to do so. This situation was not a rapidly escalating police chase, requiring split second decision-making. See *Porter* at 1139. Samuel was handcuffed and on the ground while the officers were just talking amongst themselves and continuing to apply weight to his back.

Facing similar facts, the *Garlick* Court ruled that the deliberate indifference standard applied to a positional asphyxia case. The Court stated, "[v]iewing the record evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could conclude from [the officers'] alleged conduct [of] pressing body-weight on [decedent's] back for a prolonged period that these officers were deliberately indifferent to the risk posed by their conduct to [decedent's] unjustified deprivation of liberty." *Garlick* at 1170-71; see also *Greer,* 229 F. Supp. at 1108 (holding that where the evidence can "support both standards, [] the determination should be left to the jury.") Here, a jury could find that the officers had time to deliberate. For that reason, there are genuine issues of disputed facts as to plaintiffs' Fourteenth Amendment claims for loss of familial relations.

### E. Defendants are Not Entitled to Qualified Immunity

Defendants argue they are entitled to qualified immunity because Plaintiffs "cannot meet their burden to show that clearly established law" prohibited Defendants' actions in 2017, (Dkt. 68, 18:15-18). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

Here, Plaintiffs' claims are not new or novel. The notion that officers can cause a suspect's death by applying body weight to the back of a prone individual has been known for decades. The preeminent case on the subject, *Drummond*, is nearly twenty (20) years old and that case itself cites several examples of such deaths from the 1990s. *Drummond* at 1059-1060.

*Drummond* created clearly established law on a particularized level sufficient to give fair and clear warning to officers. See *White v. Pauly*, 580 U.S. 73, 78-80 (2017); and also *Greer v. City of Hayward*, 229 F. Supp. 3d at 1106 (explaining that "*Drummond* is sufficiently similar to the specific context of this case that it clearly warned officers that when a suspect is handcuffed and prone on the ground, further restraint measures, if applied as alleged here, would be unconstitutional.") Therefore, the Defendants are not entitled to qualified immunity.

F. **Finally, Genuine Issues of Material Facts Exist as to Plaintiffs' *Monell* Claims**

Plaintiffs have put forth two main theories for *Monell* liability. First, Plaintiffs have alleged that Defendant City of Vacaville is liable under *Monell* for "having a policy, custom and practice of not assigning CIT Officers to respond to mental health crisis calls; of not requiring officers to de-escalate their interactions in 5150 situations; failing to train, or inadequately training, its officers on how to deal with persons suffering from psychiatric or psychological problems." (See Dkt. 28, SAC, ¶ 47). Second, Plaintiff have also alleged that Vacaville is liable under *Monell* for "having a policy, custom and practice of allowing officers to place considerable weight for prolonged periods of time on suspects in a prone position; … and failing to train, or inadequately training, about the dangers of positional asphyxia." (See Dkt. 28, SAC, ¶ 48).

Section 1983 liability of a local governing body may not be based on *respondeat superior*. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978). Instead, a plaintiff must establish a "direct causal link" between the municipal policy or custom and the alleged constitutional violation. See *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 681 (9th Cir. 2021). This "requires showing both but for and proximate causation." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143, 1146 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). In *Harper*, the Ninth Circuit approved of a jury instruction that explained that proximate cause exists where "an act or omission played a substantial part in bringing about or actually causing the injury or damage to plaintiffs." *Harper*, 533 F.3d at 1026 (emphasis added).

"A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations," amounting to deliberate indifference. *Tsao*, 698 F.3d at 1143. "To show [such] deliberate indifference," a plaintiff must demonstrate "that [the municipality] was on actual or constructive notice that its omission would likely result in a constitutional violation. Only then does the omission become 'the functional equivalent of a decision by [the municipality] itself to violate the Constitution.'" *Id.* at 1145 (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)) (internal quotations and citations omitted). Moreover, a policy can be established even based on a single incident; "the Supreme Court has opined that a single incident of excessive force, coupled with evidence that a city had neglected to train its armed officers on the constitutional limitations on using

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT 12

force against [suspects], might establish that the city manifested deliberate indifference in training law enforcement. *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016).

Turning first to positional asphyxia, as explained above, since 2003 the Ninth Circuit has placed all municipalities in California and throughout the circuit on notice that the placement of weight on the back of a prone and handcuffed suspect can lead to death. *Drummond* at 1059-60. In fact, the *Drummond* Court discussed how the City of Anaheim drafted a bulletin for its officers regarding the dangers of positional asphyxia as far back as 1998. *Drummond* at 1059.

Yet here, Vacaville's own PMK testified that Vacaville's training materials in effect in 2017 neither mentioned positional asphyxia nor alerted its officers of the dangers of applying pressure to the back of a prone and handcuffed suspect. Worse still, the defendant officers testified that they were never trained by Vacaville that placing body weight on the back of a prone and handcuffed individual could lead to death. In fact, Sgt. Spencer, who was the officer in charge of the scene in this case, still doesn't believe that pressure to the back of a prone and handcuffed suspect can cause death! Similarly, Officer J. Bailey testified that Vacaville officers are actually trained *to place body weight* on the back of prone and handcuffed officers[5]. (DMF 22 and 23). A reasonable trier of fact can, on these facts, reach the conclusion that Vacaville had a policy of inaction and omission in their training, which "played a substantial part in bringing about or actually causing the injury or damage to plaintiffs." See, e.g., *Harper* at 1026. Under these facts, a reasonable trier of fact can conclude that Vacaville was deliberately indifferent to the rights of persons such as decedent by failing to train its officers of the dangers of positional asphyxia – a known risk for over 20 years in California. See, e.g., *Briones v. City of Ont.*, No. 17-0590, 2018 U.S. Dist. LEXIS 227680, *29-34 (C.D. Cal. May 21, 2018) (denying summary judgment of similar claims based on single incident and local government's policies on dangers of positional asphyxia).

Turning to Vacaville's failures with respect to responding to calls for mental health distress,

---

[5] Q. As part of your training, are you trained that it can be dangerous for officers to put body weight on a prone suspect who is already handcuffed?

A. No. It's actually a trained technique. (J. Bailey Depo., 127:1-4).

the evidence shows that the Vacaville Police Department regularly receives calls for assistance in connection with persons undergoing a mental health crisis. However, Vacaville does not assign specially trained officers to respond to calls about people undergoing mental health crises. Here, the call to dispatch was of a potentially suicidal person. Yet, Vacaville did not have a policy of dispatching crisis intervention officers to such call and, in fact, none of the named individuals were CIT/CINT officers. (DMF 1, 4, 5, 6, and 7). When a person is injured, behaving erratically, and has recently attempted suicide, an officer's decisions may mean the difference between life and death.

The fact that the City of Vacaville truly had no policy for sending specialized and trained officers to deal with serious mental health crises can allow a reasonable juror to find Vacaville liable under *Monell*. See *Kirkpatrick v. Cty. of Washoe*, 843 F.3d at 794. Serious injuries and death are the obvious and highly predictable consequences of sending untrained and armed officers to respond to mental health crises. See, e.g., *Kirby v. City of E. Wenatchee*, No. 12-0190, 2013 U.S. Dist. LEXIS 51920, 2013 WL 1497343, at *14 (E.D. Wash. Apr. 10, 2013) (denying summary judgment given "large body of municipal liability jurisprudence shedding light on the issue of deliberate indifference in the context of tragic encounters between police officers and mentally ill individuals"); *Dorger v. City of Napa*, No. 12-440, 2012 U.S. Dist. LEXIS 124551, 2012 WL 3791447, at *4 (N.D. Cal. Aug. 31, 2012) (denying motion to dismiss based on allegations of city's "failure to train officers who might come into contact with individuals in mental health crisis or otherwise diminished mental capacity"); *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 814 F. Supp. 2d 967, 978 (E.D. Cal. 2011) ("[T]he failure to have *any* continuing education training on handling mentally ill people and the failure to address the issue *at all* in the police manual creates at least triable issues with respect to whether [the local government's] failure to train amounted to deliberate indifference . . . ." (emphases in original)). At the very least, there is a genuine is material fact on this point.

### IV. CONCLUSION

Based on the above-cited case law, facts and supporting material evidence, Defendants' Motion for Summary Judgment should be denied. Defendants' motion is procedurally and fatally defective for failing to comply with Local Rule 260. But even ignoring that, genuine issues of material facts exist as to each of Plaintiffs' causes of action, requiring that Defendants' motion be denied.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: October 12, 2022 | LAW OFFICE OF FULVIO F. CAJINA |
|  | By: /s/ *Fulvio F. Cajina* |
|  | FULVIO F. CAJINA |
|  | Attorneys for Plaintiffs CARMEL GARCIA, et al. |