1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Carmel Garcia, et al.,                          No. 2:19-cv-02621-KJM-DB

12                    Plaintiffs,                     ORDER

13        v.

14   Yuba County Sheriff's Department, et al.,

15                    Defendants.

16

17        Plaintiffs Carmel Garcia and three minor children bring this civil rights action against the

18   City of Vacaville and four individual police officers alleging the officers caused the death of their

19   son and father, Samuel Levi Yasko.  As Mr. Yasko's heirs and successors in interest, plaintiffs

20   claim violations of his Fourth and Fourteenth Amendment rights by the individual officers, as

21   well as municipal liability under *Monell*.  With fact discovery closed,[1] defendants have moved for

22   summary judgment on all three claims, or, in the alternative, for partial summary judgment.  As

23   explained below, the court **grants in part and denies in part defendants' motion for summary**

24   **judgment**.

---

[1] The parties had not completed expert discovery when the motion was submitted, *see*
Stip. & Order (Sept. 6, 2022), ECF No. 67 (setting expert discovery deadline as January 13,
2023), nor by the date this order issued, *see* Order (Mar. 23, 2023), ECF No. 102 (continuing
expert discovery deadline to July 7, 2023).

1  I.    **BACKGROUND**

2       The court has compared the parties' statements of fact, *see* Pl.'s Resp. to Stmt.

3  Undisputed Material Facts (Resp. to UMF), ECF No. 86; Def.'s Stmt.. Undisputed Material Facts

4  (UMF), ECF No. 81; Pl.'s Stmt. Disputed Material Facts (DMF), ECF No. 73-1, and reviewed the

5  cited deposition transcripts, the available body camera footage, *see* Ex. 7 (Vacaville Police

6  Officer Julie Bailey Body Camera Footage, or JB Body Camera Footage), Ex. 8 (Vacaville Police

7  Officer Chuck Bailey Body Camera Footage, or CB Body Camera Footage), and dispatch

8  recording, Ex. 1 (Dispatch Recording), of which the audio and video material was lodged with the

9  court as two flash drives, *see* Acknowledgment of Receipt, ECF No. 80; Acknowledgement of

10  Receipt, ECF No. 70.  Based on this review of the record, the court finds the following facts are

11  undisputed, except where noted.

12       A.    **The Incident**

13       On December 29, 2017, Vacaville Police Officer Julie Bailey was on duty in the City of

14  Vacaville.  Resp. to UMF 19 (citing Julie Bailey Deposition (JB Depo.) at 52:20–53:5, 55:2–22,

15  66:12–14, 71:8–12, 83:6–85:12, 86:22–25, ECF No. 73-2; Chuck Bailey Deposition (CB Depo.)

16  at 150:9–2, ECF No. 73-2).  She saw a truck parked at a gas station with the truck's door open

17  and a black male standing next to it.  *Id.* 20 (citing JB Depo. at 75:19–77:4).  She felt something

18  unusual was occurring because people do not typically linger at gas stations.  *Id.*  She pulled into

19  the gas station parking lot, confirmed the truck was not stolen and had no warrants, and watched

20  it for about five minutes to confirm nothing was wrong.  *Id.* 21 (citing JB Depo. at 77:18–78:2).

21  As she exited the parking lot, dispatch told officers to respond to a reported fight at that gas

22  station.  *Id.* 22 (citing JB Depo. at 74:23–75:9; CB Depo. at 128:22–129:2; Dustin Willis

23  Deposition (DW Depo.) at 50:5–16; David Spencer Deposition (DS Depo.) at 12:11–16, 55:17–

24  56:25), 23 (citing JB. Depo. at 75:10–18, 78:3–10).

25       Officer J. Bailey[2] pulled back into the parking lot.  *Id.* 24 (citing JB Depo. at 79:3–16).  A

26  man flagged her down, pointed to the white truck she had seen earlier, and said it looked like

---

[2] For clarity, the court refers to Officers Julie Bailey and Chuck Bailey by their first initial and last name.

1   people were beating up a man on the ground.  *Id.*  At the same time, dispatch advised that a

2   second caller reported they were trying to stop a man from killing himself at the same location.

3   *Id.* 25 (citing JB Depo. at 79:17–80:11; CB Depo. at 129:11–16, 183:5–24).  Officer J. Bailey

4   then requested cover officers as she drove toward the white truck, which was parked near a

5   dumpster enclosure and surrounded on three sides by a brick wall.  *Id.* 26 (citing JB Depo. at

6   80:12–19; CB Depo. at 129:20–130:7), 27 (citing JB Depo. at 80:23–82:5, 93:14–21; JB Body

7   Camera Footage at 0:35–40).

8         Upon her arrival, she saw the same black male, later identified as Jason Hays, standing at

9   the rear bumper of the truck, *see id.* 27 (citing JB Depo. at 80:23–82:5, 93:14–21; JB Body

10  Camera Footage at 0:35–40), and another man, later identified as Mr. Yasko's brother Joseph

11  Sturgeon, near the driver's door, *see id.* 28 (citing JB Depo. at 82:6–11, 93:22–25); Opp'n at 1,

12  ECF No. 73.  As she approached the truck, Mr. Hays motioned to the man on the ground, Samuel

13  Levi Yasko, and told her he was trying to stop Mr. Yasko from killing himself.  Resp. to UMF 32

14  (citing JB Depo. at 90:20–92:9).  Mr. Yasko then rose to a kneeling position; the officer ordered

15  him to get on the ground.  *Id.* 33 (citing JB Depo. at 92:10–15, 94:3–13, 94:18–24, 101:4–7; JB

16  Body Camera Footage at 0:41–53).  She saw a "large knot" on Mr. Yasko's forehead, and

17  Mr. Hays, a friend of Mr. Yasko's, explained the knot appeared after Mr. Yasko had jumped or

18  fallen from a two-story building in a suicide attempt earlier that day.  *Id.* 34 (citing JB Depo. at

19  145:25–146:15; DS Depo. at 56:4–9, 62:6–17, 117:19–25); Opp'n at 1.

20        Following Officer J. Bailey's instruction, Mr. Hays and Mr. Sturgeon physically forced

21  Mr. Yasko to the ground.  Resp. to UMF 35 (citing JB Depo. at 92:10–18, 94:18–95:3, 100:21–

22  101:3); JB Body Camera Footage at 0:55–1:24.  Mr. Yasko then lay face down, with his stomach

23  on the floor.  *Id.*  He did not react violently but did initially resist Mr. Hays' and Mr. Sturgeon's

24  efforts to place him on the ground.  Resp. to UMF 37 (citing JB Depo. at 96:14–19); JB Body

25  Camera Footage at 0:55–1:24.  Officer J. Bailey further instructed Mr. Hays to remain on top of

26  Mr. Yasko, and said if Mr. Yasko began to resist, she would have to tase him.  Resp. to UMF 39

27  (citing JB Depo. at 101:18–25); JB Body Camera Footage at 1:18–1:29.  Officer J. Bailey stood

1   between Mr. Yasko and the wall of the dumpster, *see* Resp. to UMF 42 (JB Depo. at 98:4–11),

2   with her taser drawn waiting for cover officers to arrive, *see id.* 43 (JB Depo. at 99:22–100:12).

3          Shortly thereafter, Vacaville Police Officer Chuck Bailey, Sergeant David Spencer and

4   Corporal Dustin Willis arrived on the scene.  *Id.* 45 (citing JB Depo. at 104:14–105:8, 106:4–6,

5   107:4–20; CB Depo. at 127:12–19, 130:14–18, 146:12–16; DW Depo. at 52:8–17; DS Depo. at

6   12:11–16).  Mr. Yasko remained on the ground, with Mr. Sturgeon and Mr. Hays on top of him.

7   *Id.* 49 (citing JB Depo. at 105:9–24; CB Depo. at 132:12–133:2, 134:5–135:12, 136:4–15).  The

8   officers ordered the two men to move away, and they did.  *Id.*  At that point, Mr. Hays and

9   Mr. Sturgeon had remained on Mr. Yasko for less than a minute, following Officer J. Bailey's

10  instructions.  *Id.* 40 (citing JB Depo. at 104:6–11).

11         Because of the conflicting information she had received, Officer J. Bailey did not know

12  the cause of Mr. Yasko's mental distress—whether it was a mental health condition, physical

13  health problem or drug-induced.  *Id.* 52 (citing JB Depo. at 145:16–24), 53 (citing JB Depo. at

14  143:24–144:11; DS Depo. at 60:18–25).  She and the other officers decided to handcuff

15  Mr. Yasko to prevent him from harming himself.  *Id.* 53 (citing JB Depo. at 143:24–144:11; DS

16  Depo. at 60:18–25).  She reassured the others he did not have a weapon.  *See* CB Body Camera

17  Footage at 1:28–1:35

18         Most of what happened next is contested.  The court summarizes the record in the light

19  most favorable to plaintiffs, "so long as their version of the facts is not blatantly contradicted by

20  the video evidence[.]"  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing

21  *Scott v. Harris*, 550 U.S. 372, 378–79 (2007)).

22         Officer J. Bailey sat on top of Mr. Yasko, applying pressure to his back, and attempted to

23  place his arms behind his back to handcuff his wrists.  *See* Resp. to UMF 59 (citing JB Depo. at

24  108:14–109:10; DW Depo. at 54:22–55:9, 55:22–56:5; DS Depo. at 35:20–38:5); *see also* JB

25  Body Camera Footage at 2:12–3:38.  Officer C. Bailey placed his knee on Mr. Yasko's upper

26  back and/or lower neck to restrain him against the ground, and he also occasionally used his

27  hands to press down on Mr. Yasko's back.  *See* Resp. to UMF 65 (citing JB Depo. at 109:21–

28  110:13, 111:8–10; CB Depo. at 141:19–142:8, 142:21–143:9, 144:18–24, 152:8–153:8, 153:14–

4

24; DW Depo. at 56:11–18, 95:5–22); JB Body Camera Footage at 2:58–4:16.  Corporal Willis used his foot, and perhaps knee, to pin Mr. Yasko's back, arm and/or shoulder to the ground.  *See* Resp. to UMF 67 (citing DW Depo. at 97:19–98:18, 113:17–116:9); JB Body Camera Footage at 3:44–6:50; CB Body Camera Footage at 2:24–5:08.  The officers continued to struggle to place handcuffs on Mr. Yasko, while the sounds Mr. Yasko made indicated he struggled to breathe.  *See* Resp. to UMF 61 (citing JB Depo. at 125:13–22; CB Depo. at 153:22–24; DS Depo. at 21:6–25); JB Body Camera Footage at 1:56–4:10.  Mr. Yasko repeatedly pulled his arms under his body, in an apparent attempt to push himself up, as the officers pulled his arms behind his back.  *See* Resp. to UMF 69 (citing JB Depo. at 96:8–19, 112:2–13; 121:21–25, 125:24–126:3; CB Depo. at 154:4–156:5; DS Depo. at 23:15–24:3); JB Body Camera Footage at 1:56–3:37.  During the struggle, Sergeant Spencer knee-kicked Mr. Yasko's side and/or back.  *See* Resp. to UMF 72 (citing JB Depo. at 96:8–19, 112:2–13, 121:21–25, 125:24–126:3; CB Depo. at 154:4–156:5; DS Depo. at 23:15–24:3); *see, e.g.*, CB Body Camera Footage at 1:47–1:55.

It is uncontested the officers spent over two and a half minutes attempting to get Mr. Yasko's hands behind his back, Resp. to UMF 83 (citing JB Body Camera Footage at 1:48–4:11), and that he was still making some verbal noises after he was secured in handcuffs, *id.* 85 (citing JB Body Camera Footage at 5:10–5:11, 6:13–6:16).  After the officers succeeded in handcuffing Mr. Yasko, they alternated keeping at least one officer's body weight on him.  *See* JB Body Camera Footage at 4:10–6:57; CB Body Camera Footage at 2:46–5:08.  As they maintained this body-weight pressure on him, they talked, discussed their next steps, and even made jokes.  *See* JB Body Camera Footage at 4:10–6:57; CB Body Camera Footage at 2:46–5:08.  While he did not comply with handcuffing, at no point can Mr. Yasko be said to have been obviously combative or assaultive toward the officers.  *See* JB Body Camera Footage at 1:56–6:57; CB Body Camera Footage at 00:18–5:08.  Over the course of several minutes beginning before Mr. Yasko was handcuffed and concluding after, his labored breathing steadily became quieter, until the breathing was no longer detected as audible by the officers' body cameras.  *See* JB Body Camera Footage at 2:37–5:30; CB Body Camera Footage at 2:09–5:35.

1    In total, the officers kept applying body-weight pressure to Mr. Yasko for more than 4

2 minutes.  *See* JB Body Camera Footage at 1:56–6:57; CB Body Camera Footage at 00:38–5:08.

3 Mr. Yasko was compelled to lie prone on the ground for over six minutes.  *See* JB Body Camera

4 Footage at 1:01–7:11.  He remained in a prone position while handcuffed for approximately three

5 minutes, before the officers rolled him onto his side.  *See* JB Body Camera Footage at 4:10–7:11;

6 CB Body Camera Footage at 2:46–6:17.  Once he was on his side, the officer could begin to

7 apply a WRAP device[3] to further restrain him.  *See* Resp. to UMF 86 (citing DS Depo. at 84:25–

8 85:09; JB Body Camera Footage at 5:45–6:19).  Before they were able to place the WRAP

9 restraint around Mr. Yasko's body, however, the officers noticed Mr. Yasko was not responding

10 to their questions; they rolled him over to check if he was breathing, and at that point confirmed

11 he was in fact not breathing.  *Id.* 91 (JB Depo. at 117:24–118:5, 118:25–119:3, 120:13–19; CB

12 Depo. at  94:19–95:12, 96:7–101:3, 159:14–25, 160:6–12; DW Depo. at 128:21–130:6; DS Depo.

13 at 46:1–16, 49:10–13, 49:24–50:3, 102:19–103:4); *see also* JB Body Camera Footage at 6:44–

14 7:31; CB Body Camera Footage at 5:20–6:06.

15    The officers proceeded to rub Mr. Yasko's sternum to elicit a response.  Resp. to UMF 92

16 (citing JB Depo. at 123:7–14; CB Depo. at 161:8–12).  He did not respond, and so the officers

17 took steps immediately to address the fact that Mr. Yasko had stopped breathing.  *See, e.g.*, JB

18 Body Camera Footage at 7:02–7:28.  Officer J. Bailey performed cardiopulmonary resuscitation

19 (CPR) until paramedics arrived and took over.  Resp. to UMF 92 (citing JB Depo. at 123:7–14;

20 CB Depo. at 161:8–12), 93 (citing JB Depo. at 124:9–18), 94 (citing JB Depo. at 118:25–119:10,

21 123:15–25; CB Depo. at 181:15–22).  Mr. Yasko experienced cardiopulmonary arrest and died

22 several days later.  *Id.* 96 (citing Arnold Josselson Deposition (Josselson Depo.) at 30:8–16, 42:6–

23 12, 90:19–96:12, 101:1–21).

---

   [3] Neither the parties nor the record describe the WRAP restraint device.  Vacaville Police Department Policy 325 implies the WRAP is a brand name restraint used "to restrain a violent or potentially violent person during the course of an arrest and/or transportation."  Vacaville PD Policy 325.2.3, Crawford Decl., ECF No. 69; *see also* Vacaville PD Policy 325.2.4, Crawford Decl., ECF No. 69.

1          **B.      The City's Policies**

2          The City of Vacaville (the City) has several written policies about how police should

3 respond to mental health crises and restrain individuals in crisis.  Vacaville Police Department

4 Policy 466 describes crisis intervention techniques (CIT), how to respond to individuals

5 experiencing mental health crises and de-escalation strategies.  *See* Resp. to UMF 97, 101;

6 Vacaville PD Policy 466 at 355–56, Crawford Decl., ECF No. 69.[4]  Policy 466.5 clarifies officers

7 should use "reasonable tactics" when responding to mental health crises but does not "limit an

8 officer's authority to use reasonable force" in those circumstances.  Vacaville PD Policy 466 at

9 355; *see also* Resp. to UMF 98.  Policies 308 and 325 detail how to use control devices, restraints

10 and techniques, including the WRAP restraint device.  *See* Resp. to UMF 99, 100; Vacaville PD

11 Policy 308 at 349, Crawford Decl., ECF No. 69; Vacaville PD Policy 325 at 350–51, Crawford

12 Decl., ECF No. 69.  The policies caution officers not to roll restrained individuals onto their

13 stomachs so the individuals can maintain a free flow of air.  *Id.*  The policies do not mention

14 "positional asphyxia," the risk of suffocation when officers place people in a prone position and

15 apply body-weight pressure to their backs.  *See* Resp. to UMF 102 (citing Lieutenant Bryan

16 Larsen Deposition (BL Depo.) at 24:17–25, 30:19–32:14, 33:3–34:9, 34:18–35:12, 49:21–50:12,

17 51:10–20; JB Depo. at 127:1–4; CB Depo. at 105:19–25; DS Depo. at 77:22–78:18).  All officers

18 were provided copies of these policies and required to acknowledge receipt electronically.  *Id.*

19          For "many" years, the City has trained its officers in de-escalation.  *See* Resp. to UMF 103

20 (citing BL Depo. at 29:16–30:4, 37:18–38:7); BL Depo. at 38:24-38:2 (describing training as

21 provided "since at least December of 2017").  It provides twelve to eighteen hours each year of

22 defensive techniques training to its officers, although the parties dispute whether officers were

23 trained about the risks of positional or restraint asphyxia.  *See id.* 104 (citing BL Depo. at 29:16–

24 30, 49:21–50, 51:10–20; Officer Aaron Love Deposition (AL Depo.) at 20:18–21:20, 22:18–

25 28:21, 30:24–38:22, 39:24–50:2, 53:7–56:20, 57:25–59:3, 60:5–66:25, 72:4–76:19, 79:1–91:1,

26 95:16–98:25, 101:7–102:21, 107:4–113:1, 115:6–120:24; JB Depo. at 127:1–4; CB Depo. at

---

[4] The pages cited in ECF No. 69 are those applied by the CM/ECF system.

105:19–25; DS Depo. at 77:22–78:18; DW Depo. at 87:3–23).  The City further trains its officers
to place prone suspects on their sides—in a "recovery position"—to facilitate breathing "as soon
as it's safe."  CB Depo. at 96:7–101:25 (explaining when and when not safe to move prone
suspect into recovery position); *see id.* at 94:19–95:12; JB Depo. at 118:6–8, 120:13–19.  The
City also required officers to complete CIT training.  *See* AL Depo. at 94:15–95:15, 102:22–
103:9, 104:2–22, 106:5–107:3, 108:3–14.  However, the officers testified they did not receive this
training and uniformly were unaware that body-weight pressure on the torso of a prone,
handcuffed person was dangerous.  *See* JB Depo. at 48:25–50:15, 127:1–4; CB Depo. at 62:25–
63:11, 105:19–25; DS Depo. at 77:22–78:18; DW Depo. at 87:3–23.

## C.     Procedural Background

As noted, plaintiffs are Mr. Yasko's mother and minor children.  Second Am. Compl.
(SAC) ¶¶ 1–3, ECF No. 28.  After several rounds of motions to dismiss, plaintiffs' civil rights
lawsuit is proceeding under 42 U.S.C. § 1983 against the City, Officers J. Bailey and C. Bailey,
Corporal Willis and Sergeant Spencer.  *See generally id.*  As noted, plaintiffs allege violations of
Mr. Yasko's Fourth  Amendment right to be free from excessive force.  *See id.* ¶¶ 34–38.
Plaintiffs claim standing to bring this claim as Mr. Yasko's heirs and successors in interest.  *See,
e.g.*, *id.* ¶¶ 1–3, 35 (relying on Cal. Civ. Proc. Code §§ 377.30, 377.60); *but see* Answer ¶ 22,
ECF No. 55.  The court at this point has no reason to sua sponte question plaintiffs' assertion of
standing.  Plaintiffs also bring their own Fourteenth Amendment claims asserting interference
with familial relations.  SAC ¶¶ 39–45.  Lastly, plaintiffs bring a *Monell* claim against the City.
*Id.* ¶¶ 46–49.[5]

Defendants move for summary judgment on all claims, or in the alternative, for partial
summary judgment.  *See* Mot., ECF No. 68.  They argue there are no genuine disputes of fact and
plaintiffs' claims are not supported by evidence.  *See id.* at 11–20; *see also* Crawford Decl., ECF
No. 60; UMF.  Defendant officers also claim qualified immunity.  *See* Mot. at 16–18.  Plaintiffs

---

[5] The court notes the third claim's header is duplicative of the second claim's and
erroneously states it concerns plaintiffs' Fourteenth Amendment rights as to officers.  The court
understands the third claim to advance theories of municipal liability for violating plaintiffs' and
Mr. Yasko's constitutional rights.

1   oppose the motion, pointing to facts they say are contested.  *See* Opp'n; Resp. to UMF.

2   Defendants replied, in part objecting to plaintiffs' evidence.  Reply, ECF No. 88.

3        The motion is now fully briefed.  The court heard oral argument on December 9, 2022.

4   *See* Hr'g Mins., ECF No. 93.  Fulvio Cajina and Stanley Goff appeared for plaintiffs, and Sheila

5   Crawford represented defendants.  *Id.*

6   **II.   LEGAL STANDARD FOR SUMMARY JUDGMENT**

7        Summary judgment is appropriate if "there is no genuine dispute as to any material fact

8   and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

9   "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

10  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

11  of the suit under the governing law."  *Id.*  The same standard applies to motions for partial

12  summary judgment.  *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment,

13  identifying each claim or defense—or the part of each claim or defense—on which summary

14  judgment is sought.").

15       The party moving for summary judgment must first show no material fact is in dispute.

16  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  It can do so by showing the record

17  establishes facts beyond genuine dispute, or it can show the adverse party "cannot produce

18  admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The nonmoving party must

19  then "establish that there is a genuine issue of material fact."  *Matsushita Elec. Indus. Co. v.*

20  *Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  Both parties must cite "particular parts of

21  materials in the record."  Fed. R. Civ. P. 56(c)(1).  The court views the record in the light most

22  favorable to the nonmoving party and draws reasonable inferences in that party's favor.

23  *Matsushita*, 475 U.S. at 587–88; *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

24       The Supreme Court has taken care to note that district courts should act "with caution in

25  granting summary judgment," and have authority to "deny summary judgment in a case where

26  there is reason to believe the better course would be to proceed to a full trial."  *Anderson*,

27  477 U.S. at 255.  A trial may be necessary "if the judge has doubt as to the wisdom of terminating

28  the case."  *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1507 (9th Cir.

1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)).  This may be so "even in the absence of a factual dispute." *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

## III.   DEFENDANTS' EVIDENTIARY OBJECTIONS

Generally, the admissibility of evidence at summary judgment is governed by different standards than apply at trial.  At summary judgment, Rule 56 allows objections to evidence when "the material cited . . . cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  As this language suggests, at summary judgment, the propriety of evidence depends not on its form, but on its content.  *Celotex*, 477 U.S. at 324; *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001).  The party asking the court to consider evidence bears the burden to prove it could be presented in an admissible form.  *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  If the opposing party objects, the proponent must direct the court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010).

An objection's context is crucial.  "Because '[v]erdicts cannot rest on inadmissible evidence' and a *grant* of summary judgment is a determination on the merits of the case," a moving party's evidence must be admissible.  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1121 (E.D. Cal. 2006) (alterations and emphasis in original) (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)).  But a party who opposes summary judgment can prevail by demonstrating "a question of fact remains for trial," so courts have commonly "treat[ed] the opposing party's papers more indulgently than the moving party's papers." *Id.* (quoting *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985)).  District courts have discretion "to be somewhat lenient" if the opposing party's evidence falls short of the "formalities of Rule 56." *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993); *see also Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th

1  Cir. 1979) ("[C]ourts generally are much more lenient with the affidavits of a party opposing a

2  summary judgment motion.").  For example, on review of summary judgment, the Ninth Circuit

3  has considered the hearsay contents of a diary whose substance would have been admissible in

4  another form at trial.  *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).  Authenticity

5  problems also might be excused if those problems likely could be cured.  *See, e.g.*, *Welenco, Inc.*

6  *v. Corbell*, 126 F. Supp. 3d 1154, 1163 (E.D. Cal. 2015).

7         Some evidentiary objections are a poor fit for resolution at summary judgment.  That is

8  true first and foremost of form objections and objections based on relevance, vagueness and

9  speculation.  To the extent these objections attack the content of the evidence rather than its form,

10  they duplicate Rule 56 itself.  Courts disregard irrelevant, indecipherable or speculative evidence,

11  *see, e.g.*, *Burch*, 433 F. Supp. 2d at 1119, and a party cannot avoid summary judgment with vague

12  assertions or speculation, *see* Fed. R. Civ. P. 56(c)(1).  At the same time, an objection that

13  testimony is argumentative or mischaracterizes the record either calls for a credibility

14  determination unsuited for summary judgment or would better be directed at the underlying

15  evidence itself.  *See, e.g.*, *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1033–

16  34 (C.D. Cal. 2013).

17        In defendants' reply, they object to plaintiffs' evidence.  Reply at 9–10.  They raise many

18  objections, which can be boiled down to three categories.  First, defendants object to the content

19  of the evidence as not creating a disputed material fact or as not supporting the purported facts.

20  *See, e.g.*, *id.* at 10 ("Defendants object to the following facts as the cited evidence does not

21  support the purported facts . . . .").  As explained above, these objections attack the content of the

22  evidence rather than its form, duplicating Rule 56, and thus are denied.

23        Second, defendants object to plaintiffs' characterizations of the evidence, such as the

24  "body camera recordings show Decedent's breathing becoming shallower . . . [which] is improper

25  expert opinion [because it] necessitate[s] specialized medical knowledge."  *Id.*  Similarly,

26  defendants object to plaintiffs' "interpretation of the body camera [footage] . . . [which] does not

27  create a dispute of fact."  *Id.*  These objections could be construed to require the court to make

28  improper credibility determinations about the evidence.  To the extent these objections attack the

1    underlying evidence, the objections are denied.  However, to the extent the objections solely

2    concern plaintiffs' characterization of the evidence in the parties' separate statements, these

3    objections are redundant of Rule 56 itself because they challenge the authenticity of a dispute of

4    material fact.  The court addresses whether there are genuine disputes of material fact in the

5    following section.

6         Lastly, defendants object to two particular types of evidence: deposition testimony and

7    body camera footage.  Defendants put forward no reasons to find this evidence inadmissible.  The

8    content of the depositions could be admitted at trial in lieu of witness testimony or used for

9    impeachment; there are no reasons to conclude the body camera footage will be inadmissible at

10   trial.  As a result, the court denies defendants' evidentiary objections to plaintiffs' evidence.

11   **IV.   SUMMARY JUDGMENT ANALYSIS**

12        Plaintiffs bring three claims against defendants under 42 U.S.C. § 1983: (1) individual

13   officer liability for violation of Mr. Yasko's Fourth Amendment right to be free from excessive

14   force; (2) individual officer liability for violation of plaintiffs' Fourteenth Amendment right to be

15   free from interference with familial association; and (3) municipal liability for violation of

16   plaintiffs' and/or Mr. Yasko's constitutional rights.  *See generally* SAC.

17        Defendants move for summary judgment on all claims.  They first argue the undisputed

18   evidence shows the officers acted reasonably and thus did not violate Mr. Yasko's Fourth

19   Amendment rights.  Mot. at 12–14.  Even if they did violate his rights, they claim qualified

20   immunity shields them from Fourth Amendment liability.  *Id.* at 16–18; *see* Reply at 6–7.

21   Second, defendants contend the undisputed evidence shows the officers acted without any time

22   for actual deliberation and without any purpose to harm.  Mot. at 14–15; Reply at 5.  Therefore,

23   they maintain they could not have violated plaintiffs' Fourteenth Amendment rights.  Mot. at 14–

24   16.  Even if they did violate plaintiffs' rights, they claim qualified immunity shields them from

25   any Fourteenth Amendment liability.  *Id.* 16–18.  Lastly, defendants argue no evidence supports

26   plaintiffs' *Monell* claim against the City.  Mot. at 18–20; Reply at 8–9.

For each claim, plaintiffs respond that body camera footage and deposition testimony create genuine disputes of material fact that should be decided by a jury, which could find for plaintiffs.  Opp'n at 2.  The court takes the parties' arguments in turn, by claim.

**A.      First Claim: Fourth Amendment Violation on Behalf of Mr. Yasko**

"Reasonableness is always the touchstone of Fourth Amendment analysis, . . . [and t]he operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure." *County of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 427–28 (2017) (internal citations and marks omitted).  This approach requires weighing competing interests.  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

In striking this balance, the court "must consider the risk of bodily harm that [officer's] actions posed to [decedent] in light of the threat to the public that [officer] was trying to eliminate." *Scott*, 550 U.S. at 383.  The court looks to "a non-exhaustive list of factors" to evaluate reasonableness.  *Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013). *Graham* provides three key factors, which are sensitive "to the facts and circumstances of each particular case[:] . . . the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

This reasonableness analysis is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  "The most important factor is whether the suspect posed an immediate threat." *Zion v. County of Orange*, 874 F.3d 1072, 1075 (9th Cir. 2017) (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)).  Because this inquiry "requires a jury to sift through disputed factual contentions, . . . summary judgment . . . in excessive force cases should be granted sparingly."  *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc); *see also Maxwell*, 708 F.3d at 1086.

1          **1.      Fourth Amendment Violation: Excessive Force**

2          Plaintiffs claim defendant officers violated Mr. Yasko's Fourth Amendment right to be

3   free from excessive force when the officers applied physical force to his prone, handcuffed body

4   for an extended period of time.  Opp'n at 6–8.  Defendants move for summary judgment because,

5   they say, the undisputed evidence shows the officers' use of force was objectively reasonable.

6   Mot. at 12–13.  Although defendants do not expressly analyze each of the *Graham* factors, those

7   factors are the benchmark for adjudging reasonable uses of force, weighed against the force's

8   severity.  Here, the analysis ultimately requires the consideration of a raft of disputed facts; both

9   the severity of the force and the *Graham* factors turn on the disputed record.

10          Defendants claim their use of force was reasonable because it was not severe and applied

11   only to prevent Mr. Yasko from "trying to escape their control."  Mot. at 13.  They say Officer J.

12   Bailey's body weight applied to Mr. Yasko was only meant to hold him still.  *Id.*; *see also id.* at 7

13   (citing JB Depo. at 108:14–109:10).  They claim Officer C. Bailey only applied pressure with his

14   knee when Mr. Yasko pushed up against him, *id.* at 13, 7 (citing CB. Depo at 143:15–144:24),

15   Officer Spencer kicked Mr. Yasko's side or back to induce compliance, *id.* at 13, 8 (citing DS

16   Depo. at 96:3–97:2), and Officer Willis's foot on Mr. Yasko's arm and back did not apply

17   pressure because the officer kept his weight pressed against the wall behind him, *id.* at 13, 8

18   (citing DW Depo. at 97:18–98:18).  Defendants also say the record shows Mr. Yasko was "in a

19   prone position for no more than 44 seconds after he stopped struggling . . . ."  Mot. at 14.

20          Plaintiffs dispute all these facts.  They argue the body camera footage shows the officers

21   "appl[ied] pressure to [the decedent's] back for approximately three minutes *after* [the decedent]

22   was handcuffed."  Opp'n at 7–8 (emphasis in original).  Plaintiffs also claim the body camera

23   footage shows each officer applying pressure—whether by sitting on Mr. Yasko's buttocks

24   (Officer J. Bailey), kneeling on his back (Officer C. Bailey), pinning his torso (Sgt. Spencer) or

25   kicking his abdomen (Corporal Willis).  *Id.*

26          The court's independent review of the body camera footage does not settle the parties'

27   dispute.  A reasonable jury could find the officers appear to spend over two minutes applying

28   force non-continuously to Mr. Yasko's buttocks, back, right arm and sides, while trying to

handcuff him.  *See* JB Body Camera Footage at 1:44–4:04.  The officers knelt on Mr. Yasko's

back, sat on his buttocks and applied force to his right arm for more than an additional minute,

while he was prone, handcuffed and his breathing became quieter.  *See id.* at 4:04–5:18.  A jury

also could find Officer C. Bailey was kneeling on Mr. Yasko in such a way so as to necessarily

place his full body weight on Mr. Yasko's back.  *See, e.g.*, *id.* at 4:30.  For the next few minutes,

the officers continued to apply force to Mr. Yasko's back and body, although not continuously,

while leaving him prone and handcuffed.  *See id.* at 5:18–6:57.  A jury could conclude that it was

more than six minutes after the officers began applying force, and over three minutes after

Mr. Yasko's breathing became quieter, that the officers noticed he had stopped breathing, realized

he had no pulse, and rolled him over.  *See id.* at 6:57–7:32.  And in total, that the officers applied

body-weight pressure to Mr. Yasko's upper body for nearly three minutes after he was

handcuffed.  *See id.* at 4:10–6:57.

   It is less clear from the video footage whether Mr. Yasko pushed up against the officers,

as defendants claim, or whether the officers indiscriminately applied force to his body, as

plaintiffs claim.  The video footage also leaves uncertain (1) how much physical force the officers

applied to Mr. Yasko, (2) what lengths of time each officer applied force to him, and (3) when his

breathing slowed.  The other body camera footage in the record does not resolve these questions

either, in part because it does not offer a continuous view of the Mr. Yasko's body.  *See* CB Body

Camera Footage at 00:26–6:06.  As a result, the severity of the force applied by the officers is

genuinely disputed by the parties and for a jury to determine.

   Viewing the record in the light most favorable to plaintiffs, the four officers applied body-

weight pressure to keep Mr. Yasko on the ground when he was prone and handcuffed in a

distressed state.  "Prevailing precedent in the Ninth Circuit is that law enforcement officers' use

of body weight to restrain a 'prone and handcuffed individual in an agitated state' can cause

suffocation 'under the weight of restraining officers,' therefore, such conduct may be considered

deadly force."  *Garlick v. County of Kern*, 167 F. Supp. 3d 1117, 1155 (E.D. Cal. 2016) (quoting

*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–67 (9th Cir. 2003)).  In

short, a jury could find the officers used deadly force.

Turning to the *Graham* factors, first, the court must consider "the severity of the crime at issue" from the perspective of the officers. 490 U.S. at 396. Defendants claim "[t]he officers were responding to reports of a fight and/or a suicidal individual . . . ." Mot. at 13. They say all four officers were advised by dispatch "to respond to a reported fight in progress at 310 Orange Drive," the address of the gas station. Mot. at 3 (citing JB Depo. at 74:23–75:9; CB Depo. at 128:22–129:2; DW Depo. at 50:5–16; DS Depo. at 12:11–16, 55:17–56:25). Further, they explain Officer J. Bailey was told by a man in the gas station parking lot that "it looked like people there were beating up a man who was lying on the ground." *Id.* at 4 (citing JB Depo. at 79:3–16). Defendants acknowledge dispatch advised the officers that another caller reported trying to stop a man from killing himself at the same location. *See id.* (citing JB Depo. at 79:17–80:11; CB Depo. at 129:11–16, 183:5–24). In contrast, plaintiffs claim the record shows officers did not know whether Mr. Yasko had committed a crime, and they were "summoned because the decedent was suicidal." Opp'n at 7; *see* DMF 3 ("Soon after defendant Julie Bailey arrived on scene, she understood that decedent was a suicide risk." (citing JB Depo. at 79:3–80:3, 90:20–91:5; JB Body Camera Footage)).

The record before the court discloses a genuine dispute regarding whether the officers on the scene thought they were responding to a fight or a mental health crisis. On the one hand, it appears undisputed all four officers did hear dispatch's initial report of a possible fight. The officers' deposition testimony suggests they were concerned about a fight or other criminal activity. *See* DW Depo. at 59:16–60:12 ("I think my mindset . . . was that we were attempting to detain this man who was displaying very clear pre-assaultive type behavior . . . ."); DS Depo. at 55:23–25 ("Initially, it was a fight in progress, and then units were, I believe, advised that there were two subjects holding a third subject down."); CB Depo. at 140:8–17 (" . . . so I don't now [sic] if he has any weapons. I couldn't tell either way"). On the other hand, dispatch's subsequent report provided a different explanation of what might be going on, which Officers J. and C. Bailey concede hearing, as well. *See* Resp. to UMF 25 (citing JB Depo. at 79:17–80:11; CB Depo. at 129:11–16, 183:5–24). Before any other officers arrived, Officer J. Bailey—the first officer on the scene—said her goal was to prevent self-harm. *See* JB Depo. at 91:25–92:6

16

1  ("Q. . . . So what was your goal after the African-American man tells you, you know, 'The guy on

2  the ground is trying to kill himself.'  Like, what were you trying to accomplish at that point?  A.  I

3  wanted to help him.  I wanted to help the man on the ground.  I wanted to stop him from hurting

4  himself."), 145:20–21 ("It was in my mind that he was in some sort of mental health crisis.").

5  She also communicated as much to the other officers when they arrived.  *See* CB Body Camera

6  Footage at 1:28–1:35.  Further, Mr. Hays or Mr. Sturgeon told the officers when they arrived that

7  Mr. Yasko was suicidal and unarmed, JB Body Camera Footage at 1:14–19, and Officer J. Bailey

8  told the other officers she could see he did not have a weapon when she first arrived, CB Body

9  Camera Footage at 1:33–1:37..  Application of the first factor—the severity of the crime at

10  issue—turns on resolution of the factual dispute regarding whether officers thought they were

11  responding to a fight or a mental health crisis.

12        Second, the court must consider the record in light of "whether the suspect poses an

13  immediate threat to the safety of the officers or others."  *Graham*, 490 U.S. at 396.  Defendants

14  claim they believed Mr. Yasko posed "an imminent threat of violence" to himself and to the

15  officers.  Mot. at 6; *see id.* at 6–7 (citing JB Depo. at 145:7–15 ("[T]he information that I was

16  receiving and the evidence of what I was seeing supported . . . that he should be detained to

17  prevent him from fighting us, fighting his friends, or being dangerous to himself."); DW Depo. at

18  59:7–60:12 ("[W]e were attempting to detain this man who was displaying very clear pre-

19  assaultive type behavior that if we were to not restrain him, that he would hurt himself or us."),

20  66:17–67:3 ("My belief, and I think all the officers' belief [sic] . . . was that if we were to let go,

21  he would try to flee or hurt us or hurt himself."); DS Depo. 58:12–60:17 ("[W]e had to deal with

22  the violence, the violent threat we were dealing with.  That was our main concern, is control him,

23  get him into . . . safety, you know, so he's not hurting himself or hurting others.")).  But plaintiffs

24  insist the record shows Mr. Yasko "was not assaultive" before he was handcuffed, and "did not

25  pose a threat to the officers" once handcuffed.  Opp'n at 7; *see* DMF 9 ("Decedent never acted in

26  an assaultive manner toward the officers.  He never swore at them, threatened them, or threw

27  punches or kicks." (citing JB Depo. at 96:8–19, 112:2–13, 121:21–25, 125:24–126:3; CB Depo.

28  at 154:4–156:5; DS Depo. at 23:15–24:3; JB Body Camera Footage; CB Body Camera Footage)).

At hearing, defendants conceded Mr. Yasko did not throw a punch or assault the officers.  The totality of the record, then, presents a genuine dispute about whether Mr. Yasko posed an immediate threat to his or the officers' safety.  On the one hand, the deposition testimony and the body camera footage show Mr. Yasko did not comply with the officers' requests in some respects.  *See* JB Depo. at 145:7–15; DW Depo. at 59:7–60:12, 66:17–67:3; DS Depo. 58:12–60:17; JB Body Camera Footage at 00:40–1:02, 2:42–2:59; CB Body Camera Footage at 00:42–1:46.  And given the indication he was suicidal, *see* Resp. to UMF 25, 32–34, the officers understandably may have been concerned about Mr. Yasko's posing an immediate threat to his own safety.  On the other hand, the body camera footage from Officers J. Bailey and C. Bailey shows Mr. Yasko lying prone on the ground, with his hands either behind his back or under his body.  *See* JB Body Camera Footage at 4:04–5:18; CB Body Camera Footage at 2:40–5:04.  In the body camera footage from early in the encounter, Officer J. Bailey can be heard reassuring the other officers Mr. Yasko had no weapon.  CB Body Camera Footage at 1:28–1:35.  This evidence could lead a reasonably jury to conclude Mr. Yasko posed no risk to anyone, particularly during the nearly three minutes when he was prone and handcuffed.  This factual question is best left to the factfinder.

Third, the court must ask what the record shows regarding  "whether [Mr. Yasko] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Defendants claim Mr. Yasko physically resisted being handcuffed.  *See* Mot. at 7 (citing JB Depo. at 109:21–110:13, 111:8–10, 125:13–126:1; DW Depo. at 55:10–15, 56:11–18, 58:21–59:6, 64:2–5, 95:5–22; DS Depo. at 78:4–25; CB Depo. at 141:19–142:8, 142:21–143:9, 144:18–24, 152:8–153:8, 153:14–24).  They further assert he was "yell[ing] like he was angry and ma[king] grunting noises." *Id.* (citing JB Depo. at 112:14–16; CB Depo. at 140:22–141:6, 150:19–152:7, 166:10–13; DW Depo. at 93:9–94:19).  In contrast, plaintiffs argue the "decedent was not trying to escape or flee . . . [but] was slowly dying under the weight of the officers."  Opp'n at 8.  Relying on the body camera footage, plaintiffs posit a "likely explanation is that, instead of struggling, the decedent was attempting to use his hands to prop himself up to better breathe when the officers piled on top of him."  DMF 32 (citing JB Body Camera Footage; CB Body Camera

Footage).  The parties' competing explanations present another genuine dispute: whether Mr. Yasko was actively resisting arrest or simply trying to position himself so he could breathe.  The court's review of the body camera footage does not settle the question; it reasonably could support either story.  *See Scott*, 550 U.S. at 379–80; CB Body Camera Footage at 00:29–1:04; JB Body Camera Footage at 2:31–3:03.  This fact, too, is best left for the jury.  Moreover, even if Mr. Yasko physically resisted being handcuffed, a jury could conclude he does not appear to resist after he is handcuffed, when the officers continued to apply body-weight pressure to his torso and upper body for nearly three more minutes.

In sum, resolution of all the *Graham* factors turns on disputed facts.  Viewing the evidence in the light most favorable to plaintiffs, the officers were responding to a suicidal person in the middle of a mental health crisis with no evidence he had committed a crime.  Mr. Yasko posed no immediate threat to the safety of the officers or others; he was lying prone on the ground.  He was not actively resisting the officers, but instead was trying to lift his body up to breathe.  Nevertheless, the officers used deadly force: they pressed down on the prone, handcuffed Mr. Yasko, "in what has come to be known as 'compression asphyxia,' [in which] prone and handcuffed individuals in an agitated state [suffocate] under the weight of restraining officers."  *Drummond*, 343 F.3d at 1056–57.  This is not to say what the jury should find; rather only that it could reasonably reach these conclusions.  "Considering the severity and extent of the force used [and] the three basic *Graham* factors, . . . the question whether the force used here was reasonable is a matter that cannot be resolved in favor of the defendants on summary judgment."  *City of Hemet*, 394 F.3d at 703.

### 2.  Qualified Immunity

Defendants claim the four officers are entitled to qualified immunity in the face of the Fourth Amendment violation.  Mot. at 16–18; Reply at 6–8.  "Qualified immunity is a judge-made doctrine designed to 'balance[] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231

1   (2009)).  The doctrine is intended to "give[] government officials breathing room to make

2   reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S.

3   731, 743 (2011).

4   　　　Courts consider a two-prong test in assessing whether qualified immunity applies.  *See*

5   *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 232.  On one prong, the court

6   "must decide whether the facts that a plaintiff has alleged or shown make out a violation of a

7   constitutional right." *Pearson*, 555 U.S. at 232 (citing Fed. R. Civ. P. 12, 50, 56; *Saucier*,

8   533 U.S. at 201) (internal citations omitted).  On the second prong, "the court must decide

9   whether the right at issue was 'clearly established' at the time of defendant's alleged

10  misconduct." *Id.* (citing *Saucier*, 533 U.S. at 201).

11  　　　"Courts have discretion to decide the order" of analyzing the two prongs.  *Tolan v. Cotton*,

12  572 U.S. 650, 656 (2014) (per curiam) (citing *Pearson*, 555 U.S. at 236).  However, when "there

13  are disputed factual issues that are necessary to a qualified immunity decision, these issues must

14  first be determined by the jury before the court can rule on qualified immunity." *Nehad v.*

15  *Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 235 (2020) (quoting

16  *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)).  This is because, "in determining the

17  established law, the court must take care not to define either the right at issue, or the defendant's

18  conduct for that matter, in a manner that impermissibly resolves factual disputes." *Gomez v. City*

19  *of Vacaville*, 483 F. Supp. 3d 850, 865 (E.D. Cal. Sept. 2, 2020) (citing *Tolan*, 572 U.S. at 657)).

20  　　　This court exercises its discretion to consider the first prong as a threshold matter.

21  Viewing the evidence in the light most favorable to plaintiffs, as analyzed above, defendants

22  violated Mr. Yasko's Fourth Amendment right to be free from excessive force.  Turning to the

23  second prong, defendants must have violated clearly established law, i.e., "existing precedent

24  must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*,

25  138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  Law

26  is settled when "it is dictated by controlling authority or a robust consensus of cases of persuasive

27  authority." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (internal citations and

28  marks omitted).  "The precedent must be clear enough that every reasonable official would

20

1   interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* (citing *Reichle v.*

2   *Howards*, 566 U.S. 658, 666 (2012)).

3          Here, defendants rely solely on disputed facts to advance their qualified immunity

4   defense.  They claim no authority "clearly prohibited [Officer J. Bailey] from placing her knees

5   on either side of Decedent and using her body weight on his lower body to try to counter his

6   attempts to get up." Mot. at 17–18.  They assert no authority "clearly prohibited [Officer C.

7   Bailey] from placing a knee on Decedent's shoulder while placing his other knee on the pavement

8   and using his ground knee to bear his weight," and only applying force when Mr. Yasko

9   physically resisted. *Id.* at 18.  They argue no authority clearly prohibited Officer Willis from

10  placing a foot on Mr. Yasko's arm without applying pressure, or clearly prohibited Officer

11  Spencer from kicking Mr. Yasko because he was fighting the officers. *Id.*  As explained above,

12  all the facts defendants would have the court assume are true are instead disputed.  It is disputed

13  whether the officers only used force when Mr. Yasko pushed up against the officers.  It is

14  disputed whether the officers bore their weight on the ground or placed it directly on Mr. Yasko.

15  It is disputed whether Mr. Yasko resisted the officers.  The court "may not resolve genuine

16  disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656.

17  Accordingly, defendants' characterization of the facts cannot support a grant of summary

18  judgment based on a finding that qualified immunity adheres.

19         Additionally, since 2003, it has been clearly established law in the Ninth Circuit "that

20  kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers'

21  bodies on [the detainee] . . . violates clearly established law[.]" *Drummond*, 343 F.3d at 1062.

22  The Circuit repeatedly has held, and district courts repeatedly have found, the law is clearly

23  established "that multiple officers' alleged use of prolonged body-weight pressure to a suspect's

24  back was known to be capable of causing serious injury or death." *Garlick*, 167 F. Supp. 3d at

25  1158 (collecting cases); *see also Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1106 (N.D.

26  Cal. 2017) (collecting cases); *but see Perez v. City of Fresno*, 591 F. Supp. 3d 725, 759–60 (E.D.

27  Cal. 2022) (distinguishing *Drummond* and finding no clearly established law because in that case

28  additional restraint was necessary for compliance and officers were acting in part at direction of

medical personnel).  The caselaw establishes the applicable clearly established law at a highly
particularized level.  The officers here were on notice by the time of their encounter with
Mr. Yasko in 2017 that using body weight to restrain an agitated, prone and handcuffed person
who poses no serious safety threat would violate the person's Fourth Amendment right to be free
from excessive force, be "substantially likely to cause death or serious injury, and such force may
not have been reasonable under the circumstances."  *Greer*, 229 F. Supp. 3d at 1107.

At hearing, defendants attempted to distinguish *Drummond* and its progeny by arguing
that here, unlike in those cases, the officers did not use their body weight for a prolonged period
of time.  They argued *Drummond* involved twenty minutes of body-weight pressure, whereas
here, Mr. Yasko was subjected to body-weight pressure for less time.  However, any distinction
with respect to total time involved does not mean the officers in this case can benefit at this stage
from their assertion of qualified immunity.  As discussed above, a reasonable jury could find the
officers applied their body weight to Mr. Yasko's prone torso and arms for more than five
minutes in total and for nearly three minutes after he was handcuffed.  Multiple cases decided by
2017 found constitutional violations, and denied summary judgment on qualified immunity
grounds, where officers applied body-weight pressure to prone, handcuffed suspects for far less
than twenty minutes.  *See, e.g.*, *Greer*, 229 F. Supp. 3d at 1103 (approximately three and a half
minutes); *Garlick*, 167 F. Supp. 3d at 1155 (eight to ten minutes).  In unpublished yet citable
opinions, the Ninth Circuit affirmed similar findings in cases with less than two-minute periods of
time.  *See, e.g.*, *Zelaya v. Las Vegas Metropolitan Police Dep't*, 682 F. App'x 565, 567 (9th Cir.
2017) (ninety seconds); *Abston v. City of Merced*, 506 F. App'x 650, 652 (9th Cir. 2013) (one
minute seven seconds).  In contrast to this caselaw, defendants point to no cases in which courts
have granted qualified immunity to officers whose use of body-weight force on the torso of a
prone, handcuffed suspect was for a time equivalent to that here.  Defendants also point to no
cases concluding as a matter of law that three to five minutes of lethal force is not a "prolonged"
period of time.

In sum, given the contested facts and clearly established law, the officers are not entitled
to qualified immunity on the Fourth Amendment claim.  Of course, this conclusion does not

1   prohibit defendants from raising qualified immunity again at trial, after the jury finds the facts on

2   any special verdict form the court approves.

3        **B.**    **Second Claim: Interference with Plaintiffs' Familial Relations (Fourteenth**

4                  **Amendment Substantive Due Process)**

5          "[T]he touchstone of due process is protection of the individual against arbitrary action of

6   government, whether the fault lies in a denial of fundamental procedural fairness, or in the

7   exercise of power without any reasonable justification in the service of a legitimate governmental

8   objective[.]" *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (internal citations and

9   marks omitted).  "Parents and children may assert Fourteenth Amendment substantive due

10  process claims if they are deprived of their liberty interest in the companionship and society of

11  their child or parent through official conduct."  *Lemire v. Cal. Dep't Corr. & Rehab.*, 726 F.3d

12  1062, 1075 (9th Cir. 2013) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

13  "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation."

14  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Lewis*, 523 U.S. at 846).  "Police

15  action sufficiently shocks the conscience, and therefore violates substantive due process, if it is

16  taken with either '(1) deliberate indifference, or (2) a purpose to harm[,] unrelated to legitimate

17  law enforcement objectives.'"  *Nehad*, 929 F.3d at 1139 (alteration in original) (quoting *A.D. v.*

18  *Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013)).

19         The litmus test for deliberate-indifference or purpose-to-harm is "whether the officers had

20  the opportunity for actual deliberation."  *Porter*, 546 F.3d at 1138.  "Where actual deliberation is

21  practical, then an officer's 'deliberate indifference' may suffice to shock the conscience."

22  *Wilkinson*, 610 F.3d at 554.  The deliberate-indifference test is subjective: it requires "the

23  conscious or reckless disregard of the consequence of one's acts or omissions.  It entails

24  something more than negligence but is satisfied by something less than acts or omissions for the

25  very purpose of causing harm or with knowledge that harm will result."  *Tatum v. Moody*,

26  768 F.3d 806, 821 (9th Cir. 2014) (quoting *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th

27  Cir. 2013)).  "On the other hand, where a law enforcement officer makes a snap judgment

28  because of an escalating situation, his conduct may only be found to shock the conscience if he

1     acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610

2     F.3d at 554.

3          "Rules of due process are not, however, subject to mechanical application . . . ." *Lewis*,

4     523 U.S. at 850. "[D]eliberation should not be interpreted in the narrow, technical sense . . . [but

5     i]nstead, the heightened purpose-to-harm standard applies where a suspect's evasive actions force

6     the officers to act quickly." *Wilkinson*, 610 F.3d at 554 (citation and marks omitted). As a result,

7     actual deliberation is practical, for example, when "officers have subdued a suspect to the point

8     that there is no longer a threat[.]" *Wroth v. City of Rohnert Park*, No. 17-05339, 2019 WL

9     1766163, at *9 (N.D. Cal. Apr. 22, 2019) (citing *I.A. v. City of Emeryville*, No. 15-04973, 2017

10    WL 952894, at *10 (N.D. Cal. Mar. 13, 2017)).

11             **1.**      **Fourteenth Amendment: Familial Relations**

12          Defendants move for summary judgment on plaintiffs' Fourteenth Amendment claim for

13    two reasons. First, they argue the Fourteenth Amendment claim must fail as a matter of law

14    because the Fourth Amendment claim also fails as a matter of law. Mot. at 14–15. However, as

15    explained above, plaintiffs' Fourth Amendment claim survives summary judgment, and so this

16    argument is unavailing. Second, defendants contend the entire incident "occurred within

17    minutes, . . . was rapidly evolving and [so] the purpose to harm standard applies." Mot. at 15.

18    Because there is no evidence of intent to harm, they argue, defendants should prevail now as a

19    matter of law. In response, plaintiffs say the officers had the opportunity for actual deliberation.

20    Opp'n at 10.

21          Although the entire incident here took less than ten minutes, including an initial period of

22    confusion and uncertainty, the court focuses on the more than two minutes that passed after

23    Mr. Yasko was subdued and when officers continued to apply force. In similarly brief or briefer

24    periods, district courts have repeatedly found actual deliberation. *See, e.g.*, *Greer*,

25    229 F. Supp. 3d at 1103 (finding time to deliberate when officers applied pressure to back after

26    compliance for 2 minutes and 40 seconds); *Garlick*, 167 F. Supp. 3d at 1170 (finding time to

27    deliberate when officers continued to apply weight to back after compliance for two to three

28    minutes); *Wroth*, 2019 WL 1766163, at *9 (finding time to deliberate when officers continued to

1  apply weight after compliance for less than two minutes).  As in *Greer*, *Garlick* and *Wroth*, the

2  officers here continued to apply weight to Mr. Yasko's prone, handcuffed body for more than two

3  minutes.  *See* JB Body Camera Footage at 4:04–6:57.  The length of time alone does not defeat an

4  opportunity for actual deliberation.

5          Defendants argue the entire incident involved Mr. Yasko's refusing to obey the officers,

6  physically resisting and remaining prone for just 44 seconds after being handcuffed.  Mot. at 15.

7  But as discussed above, the first two facts are disputed, and the third fact appears contradicted by

8  the body camera footage such that a jury could find otherwise.  Resolving the factual disputes in

9  plaintiffs' favor, as required here, the officers had an opportunity for actual deliberation.  That a

10  jury could find as much is bolstered by the body camera footage showing the officers continuing

11  to apply their body weight to Mr. Yasko's prone, handcuffed body, while heard discussing

12  possible next steps and talking informally about other matters as well, even joking.  *See* JB Body

13  Camera Footage at 4:34–6:57.  If the officers had time to chat and engage in banter, a jury well

14  could conclude they had time to deliberate about whether it was necessary to continue applying

15  body weight to a prone, handcuffed man whose breathing was growing quieter and quieter.

16          Once a suspect is subdued and no longer a threat, "it becomes practical to deliberate about

17  the type and degree of force to use in continuing to restrain the suspect."  *Wroth*, 2019 WL

18  1766163, at *9.  Here, viewing the evidence in the light most favorable to plaintiffs, assuming the

19  officers had an opportunity for actual deliberation, the proper standard is deliberate indifference,

20  not purpose to harm.  Defendants do not address the deliberate indifference standard, nor do they

21  put forward a single argument for why they prevail even under this standard.  *See* Mot. at 14–16.

22  Their reply doubles down on the argument that summary judgment is appropriate because the

23  purpose-to-harm standard applies, *see* Reply at 5, apparently conceding if the deliberate-

24  indifference standard applies, they are not entitled to summary judgment, *cf. Mazariegos

25  Koosemans v. Siskiyou Joint Cmty. Coll.*, No. 17-00809, 2021 WL 3725271, at *18 (E.D. Cal.

26  Aug. 23, 2021) ("Defendants do not address this issue in their briefing and therefore concede the

27  issue.").  Defendants cannot prevail on summary judgment with respect to plaintiffs' Fourteenth

28  Amendment claim.  Fed. R. Civ. P. 56(a).

1          **2.      Qualified Immunity**

2          Defendants claim the four officers "are entitled to qualified immunity from all of

3   Plaintiffs' claims," and thus implicitly for the Fourteenth Amendment claim.  Mot. at 18.

4   However, the case law they cite addresses only the Fourth Amendment and excessive force.  *See*

5   *id.* at 16–17; Reply at 6.  They also only point to purportedly undisputed facts that bear on the

6   excessive force claim, not the Fourteenth Amendment claim.  *See* Mot. at 17–18; Reply at 6–7.

7   Thus, it is unclear whether defendants intended to invoke qualified immunity with respect to

8   plaintiffs' substantive due process claim.  Not unreasonably, plaintiffs appear to assume

9   defendants do not invoke qualified immunity in the face of this claim.  *See* Opp'n at 11.

10         Defendants' conclusory, broad-brush assertion of qualified immunity is insufficient to

11  meet their burden under Rule 56.  A simple statement that officers are entitled to qualified

12  immunity for all plaintiffs' claims does not suffice at summary judgment.  Defendants must show,

13  but have not, "that there is no genuine dispute as to any material fact and the movant is entitled to

14  judgment as a matter of law" on qualified immunity for the Fourteenth Amendment claim.  Fed.

15  R. Civ. P. 56(a).  They say plaintiffs cannot identify any authority prohibiting the officers from

16  engaging in the above-discussed series of physical contacts with Mr. Yasko, but these facts bear

17  on the excessive force claim, not the due process claim.  They point to no facts, let alone

18  undisputed facts, regarding whether this force was deliberately indifferent in light of the officers'

19  opportunity for actual deliberation.  They do not discuss the officers' mens rea, as required under

20  the subjective deliberate-indifference standard.  *See Tatum*, 768 F.3d at 821.  At oral argument,

21  defendants did not address qualified immunity for the Fourteenth Amendment claim.  Because

22  defendants do not identify undisputed facts related to the due process claim, defendants are not

23  entitled to summary judgment on it.  *Cf. Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 354

24  n.8 (M.D. La. 2022) (finding qualified immunity waived because it was asserted in conclusory

25  fashion); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a

26  perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

27  waived.  It is not enough merely to mention a possible argument in the most skeletal way, leaving

1   the court to do counsel's work . . . .") (citing cases, including *Leer v. Murphy*, 844 F.2d 628, 634

2   (9th Cir. 1988)).

3        **C.**     **Third Claim: Plaintiffs' Assertion of Municipal Liability**

4         To establish a municipality's liability under § 1983 and *Monell v. Department of Social*

5   *Services*, 436 U.S. 658 (1978), plaintiffs must show a "policy or custom" caused a constitutional

6   deprivation. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir.) (en banc).

7   Plaintiffs also must show the City's policy or custom was a "deliberate choice . . . made from

8   among various alternatives," *id.* at 1075 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469,

9   483 (1986) (plurality op.)), and "reflects deliberate indifference to the constitutional rights of its

10   inhabitants," *id.* at 1073 (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

11        Deliberate indifference requires "a showing of notice[.]" *Id.* at 1076. "Where a § 1983

12   plaintiff can establish that the facts available to city policymakers put them on actual or

13   constructive notice that the particular omission is substantially certain to result in the violation of

14   the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *City of Canton*,

15   489 U.S. at 396 (O'Connor, J. concurring in relevant part).

16        Several theories regarding a policy or custom can support a claim against a municipality;

17   two are implicated here. First, "a plaintiff may be able to prove the existence of a widespread

18   practice that, although not authorized by written law or express municipal policy, is 'so

19   permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *City of St.*

20   *Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S.

21   144, 167–68 (1970)). A few "isolated or sporadic incidents" are insufficient. *Trevino v. Gates*,

22   99 F.3d 911, 918 (9th Cir. 1996). Liability "must be founded upon practices of sufficient

23   duration, frequency and consistency that the conduct has become a traditional method of carrying

24   out polices." *Id.* (collecting cases in which two or fewer incidents were insufficient).

25        Second, liability also may attach on a theory of inaction. Municipalities can be liable for

26   their "failure to train employees . . . where the failure to train amounts to deliberate indifference

27   to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at

28   388. But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a

1   claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma*

2   *City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality op.)).  Ordinarily, a "pattern of similar

3   constitutional violations" is necessary to show deliberate indifference for a failure to train.  *Id.*

4   However, a plaintiff might succeed without such a pattern "where 'a violation of federal rights

5   may be a highly predictable consequence of a failure to equip law enforcement officers with

6   specific tools to handle recurring situations.'"  *Long v. County of Los Angeles*, 442 F.3d 1178,

7   1186 (9th Cir. 2006) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).  For

8   example, "a single incident of excessive force, coupled with evidence that a city had neglected to

9   train its armed officers on the constitutional limitations on using force against fleeing felons,

10  might establish that the city manifested deliberate indifference in training law enforcement."

11  *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (citing *City of Canton*,

12  489 U.S. at 390 n.10).

13       Defendants characterize plaintiffs' *Monell* claim as based, first, on a widespread-practice

14  theory with respect to the City's response to mental health crises, and second, on an inadequate

15  training claim regarding the officers' use of force.  Mot. at 18–20.  In plaintiffs' opposition, they

16  clarify their *Monell* theories: first, widespread-practice and failure-to-train theories for the City's

17  response to mental health crisis calls, and second, widespread-practice and failure-to-train

18  theories regarding the risks of placing someone to induce positional asphyxia.  Opp'n at 12.  At

19  hearing, plaintiffs confirmed they rely on these four theories.

20       Having reviewed the record here, the court agrees with defendants that plaintiffs put

21  forward "no evidence" regarding a widespread practice of officers using their body weight to

22  control non-compliant suspects or of sending untrained officers to respond to mental health calls

23  because plaintiffs include "no evidence of any similar incidents[.]"  Mot. at 19.  For liability to

24  attach on a widespread-practice theory, plaintiffs must show the incident with Mr. Yasko is not an

25  isolated one.  *Trevino*, 99 F.3d at 918.  "Proof of random acts or isolated events is insufficient to

26  establish custom."  *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995) (citing *Thompson v. City*

27  *of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989)).  In short, prior incidents must put the City

28  on at least constructive notice of the need to take action.  *City of Canton*, 489 U.S. at 396.  Here,

1    no evidence shows another incident of someone detained or in custody suffering from positional

2    asphyxia or municipal officers using their body weight to control non-compliant suspects; nor is

3    there any record of constitutional violations resulting from sending untrained officers to mental

4    health calls.  *See generally* DMF.  Plaintiffs conceded at hearing there is no evidence of a prior

5    incident in the City of a similar constitutional deprivation.  Given the absence of such evidence,

6    the court **grants defendants' motion for partial summary judgment regarding both of**

7    **plaintiffs' widespread-practice theories**.

8            Two theories remain:  A failure-to-train theory as to the City's response to mental health

9    crisis calls, and a failure-to-train theory regarding the risks of positional asphyxia.  The court

10   takes these in turn.

### 1.        City's Response to Mental Health Crisis Calls

12           Defendants argue the City's policies included guidelines on "responding to mental health

13   crises [sic] situations," and thus the *Monell* claim cannot succeed because the City trained its

14   officers on how to respond to those calls.  Mot. at 19.  Plaintiffs respond by highlighting the City

15   "had no policy for sending specialized and trained officers to deal with serious mental health

16   crises," and the officers involved were not CIT officers.  Opp'n at 14.  Further, plaintiffs claim

17   the City did not provide "officers with resources to deal with persons undergoing mental health

18   crises."  DMF 6 (citing JB Depo. at 48:25–50:15; CB Depo. at 68:2–72:14; BL Depo. at 26:18–

19   27:12, 29:10–15, 39:7–22, 56:8–21, 60:16–21).  The parties' positions create a dispute regarding

20   whether the City provided officers with sufficient guidelines to respond to mental health crisis

21   calls.

22           The court's review of the record does not resolve this dispute.  On the one hand, the City

23   has identified its express policies addressing mental health crises.  *See* Vacaville PD Policy 466 at

24   354–56 (specifying signs of mental health issues, explaining coordination with mental health

25   professionals, and detailing de-escalation techniques); Vacaville PD Policy 418 at 352–53

26   (explaining policy, process, and method for mental illness commitments).  Further, Vacaville

27   Police Lieutenant Bryan Larsen, the City's designated person most knowledgeable about its

28   policies, explained in his deposition that all officers were provided copies of the policies and any

1   updates to the policies, and were required to electronically acknowledge receipt.  *See* BL Depo. at

2   30:19–35:12.  Vacaville Police Officer Aaron Love, the City's designated person most

3   knowledgeable about police training, said all officers were required to undergo crisis intervention

4   training.  AL Depo. at 94:15–21.

5          On the other hand, Officers J. Bailey and C. Bailey said they received no crisis

6   intervention training.  *See* JB Depo. at 49:16–17; CB Depo. at 63:8–11.  Officer J. Bailey

7   explained in her deposition that the City had "critical incident negotiation team[6] [officers] . . .

8   [who] receive[d] specialized training" for dealing with crisis situations, JB Depo. at 49:2–10, and

9   Officer C. Bailey said such officers were not automatically dispatched to mental health crisis

10  calls, *see* CB Depo. at 72:4–14 ("Q. [B]ased on your testimony, I'm kind of understanding that a

11  5150 situation wouldn't be this sort of reason in and out of itself to call the CINT department, the

12  CINT department; correct?  A. Correct.  Q. So the officers on the street were tasked with dealing

13  with someone undergoing a 5150 mental health issue; right?  A. Yes."); *see also* JB Depo. at

14  50:5–10.  Officer J. Bailey further explained CIT officers might "start towards the call, if they

15  were available," or arrive as cover officers, but the department did not "purposefully" send them

16  to address mental health crises.  JB Depo. at 50:1–15.  Instead, the supervisor on the scene was

17  "responsible to contact dispatch" if the officers on the scene requested CIT officers.  *Id.* at 49:20–

18  25.  Moreover, Lieutenant Larsen admitted as far as he knew, although the City's policies

19  instructed officers to consider neighborhood mediation services, de-escalation techniques and

20  other resources, no such resources were "available to officers on patrol to deal with mental health

21  issues[.]"  BL Depo. at 56:9–21.  This evidence creates a genuine dispute regarding whether the

22  City provided sufficient information to officers regarding how to respond to mental health crisis

23  calls.

24         Viewing the record in the light most favorable to plaintiffs, a reasonable jury could

25  conclude the City did not train its officers on how to respond to mental health crisis calls and this

---

[6] The court notes Officer J. Bailey uses the acronym "CINT," for critical incident negotiation team, whereas other officers refer to "CIT," for crisis intervention team.  The parties do not distinguish the terms and the record offers no explanation for the difference.  The court adopts CIT as a shorthand for what it assumes are the same type of officers.

deficiency was so likely to result in a constitutional violation that no prior incidents were needed. *See, e.g.*, *Kirby v. City of East Wenatchee*, No. 12-190, 2013 WL 1497343, at *14 (E.D. Wash. Apr. 10, 2013) ("The court has reviewed the large body of municipal liability jurisprudence shedding light on the issue of deliberate indifference in the context of tragic encounters between police officers and mentally ill individuals.  Construing the facts in the light most favorable to Plaintiff, the court concludes Plaintiff's claim falls within the narrow range of circumstances in which a City's failure to address encounters with mentally ill [sic] either in a written policy or in its training may reasonably be seen by a jury as deliberate indifference to a foreseeable need."). Here, the jury could well accept plaintiffs' argument that "[s]erious injuries and death are the obvious and highly predictable consequences of sending untrained and armed officers to respond to mental health crises." *Garcia v. Yuba Cty. Sheriff's Dep't*, 559 F. Supp. 3d 1122, 1131 (E.D. Cal. 2021) (collecting cases).

The court notes, unlike in *Kirby*, the City here does provide information to its officers on how to address mental health crises.  But this difference is not dispositive given: (1) the evidence the City had separate training for crisis intervention but no policy or practice of sending crisis intervention officers to mental health calls, (2) the conflicting evidence on whether the City actually trained its officers on crisis intervention, and (3) the evidence the City's official policy referenced resources not provided to officers.  In *Newman v. San Joaquin Delta Community College District*, the court denied summary judgment to the defendant college on a *Monell* claim for failure to train its officers to respond to mental health crisis calls, despite the college's basic and field training for all officers in responding to mentally ill people, because there was no stated policy nor continuing education.  814 F. Supp. 2d 967, 978 (E.D. Cal. 2011) ("[P]laintiffs simply argue for more training and a policy in the manual. . . . [T]he court finds that the failure to have *any* continuing education training on handling mentally ill people and the failure to address the issue *at all* in the police manual creates at least triable issues with respect to whether Delta College's failure to train amounted to deliberate indifference and was the 'moving force' behind the constitutional violations." (emphases in original)).  In *Newman*, the college had no stated policy and did provide training, although the sufficiency of the training was disputed.  Here, the

1   deficiencies are reversed, but this too is a difference without distinction.  If the City has an

2   insufficient policy and no training for the officers dispatched to mental health crisis calls, then it

3   could be found deliberately indifferent to the constitutional rights of its inhabitants, given the

4   certainty officers who respond to those calls will not be adequately trained.  On this record, there

5   are triable issues of fact regarding whether the City's failure to train amounted to deliberate

6   indifference and resulted in the constitutional violation.  The court thus denies defendants' motion

7   for summary judgment on the failure-to-train *Monell* claim regarding mental health call

8   responses.

9                    **2.    Positional Asphyxia**

10          Defendants move for summary judgment on plaintiffs' failure-to-train theory regarding

11   the risks of positional asphyxia.  They claim the "undisputed evidence shows the City provided

12   substantial training on the tactics implemented by the officers in their contact with Decedent, . . .

13   [and] no evidence [shows] the City's training programs were inadequate."  Mot. at 20; *see also*

14   Reply at 9.  Plaintiffs oppose, pointing to countervailing evidence.  *See* Opp'n at 13.  There is a

15   genuine dispute about whether the officers were trained on the risks of positional asphyxia.

16          On the one hand, Officer Larsen's and Officer Love's deposition testimony indicates the

17   City provides twelve to eighteen hours per year of training on defensive tactics, which in 2017

18   included "handcuffing, ground control techniques, placing subjects in a prone position, positional

19   asphyxia, monitoring a subjects [sic] breathing and health, signs of labored breathing, officers'

20   use of body weight on subjects, use of the WRAP device, [and] placing subjects in a recovery

21   position . . . ."  Resp. to UMF 104 (citing BL Depo. at 29:16–30:4; AL Depo. at 20:18–21:20,

22   22:18–28:21, 30:24–38:22, 39:24–50:2, 53:7–56:20, 57:25–59:3, 60:5–66:25, 72:4–76:19, 79:1–

23   91:1, 95:16–98:25, 101:7–102:21, 107:4–113:1, 115:6–120:24); *see, e.g.*, AL Depo. at 111:2–8

24   ("Q. . . . And then as best as you recall, between 2012 and 2017, when Vacaville Police

25   Department officers were being trained on positional asphyxia or concepts of positional asphyxia,

26   were they trained that body weight to the back of a suspect could increase the risks of positional

27   asphyxia?  A.  Yes.").  Further, Vacaville Police Department Policies 308 and 325 outline the use

28   of control devices, restraints and techniques, including required monitoring to prevent restrained

32

1   individuals from rolling onto their stomachs.  *See* Vacaville PD Policy 308 at 349; Vacaville PD

2   Policy 325 at 350–51.

3          On the other hand, the deposition testimony of each officer at the scene indicates the

4   officers were not trained about the risks of applying body-weight pressure to prone, handcuffed

5   persons in an agitated state.  *See* JB Depo. at 127:1–4 ("[Q.] As part of your training, are you

6   trained that it can be dangerous for officers to put body weight on a prone suspect who is already

7   handcuffed?  A.  No.  It's actually a trained technique."); CB Depo. at 105:19–25 ("Q. . . . As part

8   of your training at Vacaville PD, were you ever trained that when a subject is in a prone position

9   with weight being applied to his or her back, that that can impair the suspect's ability to breathe?

10  A.  Not that I recall."); DS Depo. at 77:22–78:18 (same); DW Depo. at 87:3–23 (same).

11  Moreover, Officer Larsen said in his deposition there was no information in the City's policies

12  and procedures in 2017 about the risks of body-weight pressure to prone, handcuffed people.  *See*

13  BL Depo. at 49:21–50:12, 51:10–20.  Policies 308 and 325, discussed above, do not mention the

14  terms "positional asphyxia" or "restraint asphyxia," nor do they discuss the risks of body-weight

15  pressure on a prone, handcuffed person.  *See* Vacaville PD Policy 308 at 349; Vacaville PD

16  Policy 325 at 350–51.

17         The conflicting evidence makes for a factual dispute about whether the City trained its

18  officers about the risks of positional asphyxia.  Viewed in the light most favorable to plaintiffs,

19  the City did not adequately train its officers.  *See, e.g.*, *Briones v. City of Ontario*, No. 17-590,

20  2018 WL 6017037, at *11 (C.D. Cal. May 21, 2018) (finding officer deposition testimony about

21  lack of training on "dangers of applying pressure to a detainee's back while he or she is in a prone

22  position" was sufficient to raise "a dispute over whether [the City] properly trained the Officers

23  about the dangers of positional and restraint asphyxia"); *but see Perez*, 591 F. Supp. 3d at 768–69

24  (granting summary judgment when one officer said he was trained about "compression asphyxia,"

25  a different officer said he was not, and the City had a policy on asphyxia).  As discussed above,

26  decades of precedent have established that body-weight pressure on a prone, handcuffed and

27  compliant person comprises deadly force and can constitute excessive force.  And as this court

28  previously noted in denying defendants' motion to dismiss, "the need to train officers in the

1    constitutional limitations on the use of deadly force in these circumstances can be said to be so

2    obvious that the failure to do so could properly be characterized as deliberate indifference to

3    constitutional rights." *Garcia*, 559 F. Supp. 3d at 1131 (quoting *City of Canton*, 489 U.S. at 390

4    n.10) (quotation marks omitted).  Given the genuine disputes regarding whether the officers here

5    were trained on the risks of positional asphyxia, defendants are not entitled to summary judgment

6    on the *Monell* claim.

7    **V.    CONCLUSION**

8         **Defendants' motion for summary judgment is granted in part and denied in part**.

9    The court **denies** the motion for summary judgment of claims one (Fourth Amendment excessive

10   force) and two (Fourteenth Amendment substantive due process).  On claim three (municipal

11   liability), the court **grants** the motion for summary judgment regarding plaintiffs' *Monell*

12   widespread-practice theories and **denies** the motion regarding their *Monell* failure-to-train

13   theories.

14        A final pretrial conference is SET for August 11, 2023.  The parties SHALL meet and

15   confer and file a joint status report 14 days prior to the final pretrial conference addressing

16   matters the court should consider in setting a trial date, including whether they request referral to

17   a magistrate judge to conduct a court-convened settlement before the final pretrial conference.

18   *See* E.D. L.R. 282; Fed. R. Civ P. 16.

19        This order resolves ECF No. 68.

20        IT IS SO ORDERED.

21   DATED:  April 26, 2023.

22

                                   _____
                                   CHIEF UNITED STATES DISTRICT JUDGE